## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | |
|---|---|
| SHALYNN J. THROW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 3:21-cv-170-JPK |
| KILOLO KIJAKAZI[1], Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Shalynn J. Throw, on behalf of Albert James Throw, seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Mr. Throw's application for Disability Insurance Benefits (DIB). The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. *See* [DE 9]. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c). For the reasons discussed below, the Commissioner's decision denying benefits is reversed and remanded.

## BACKGROUND

### A.    PROCEDURAL HISTORY

Mr. Throw filed his application for benefits on September 9, 2018, alleging disability beginning July 17, 2018. The Social Security Administration ("SSA") reviewers at the agency level denied Mr. Throw's application initially and upon reconsideration. On August 3, 2020, an Administrative Law Judge (ALJ) conducted a telephone hearing at which Mr. Throw and a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security effective July 9, 2021 and is substituted for Andrew M. Saul. *See* Fed. R. Civ. P. 25(d).

Vocational Expert (VE) testified. On September 28, 2020, the ALJ issued a decision finding Mr. Throw was not disabled. On November 24, 2020, Mr. Throw asked the SSA Appeals Council to review the ALJ's decision. Three weeks later, on December 16, 2020, Mr. Throw passed away by suicide. [DE 1-2]. On January 4, 2021, the Appeals Council denied Mr. Throw's request for review. On March 9, 2021, Shalynn Throw, Mr. Throw's wife, brought this action seeking judicial review of the ALJ's decision denying Mr. Throw's DIB application.[2]

## B.   MEDICAL HISTORY

Mr. Throw was 44 years old on September 9, 2018, when he filed his application for disability benefits. The medical records that were before the ALJ begin about eight months prior to that filing, in January 2018, when Mr. Throw sought treatment from a cardiologist because of recurring chest pain and heart palpitations. Mr. Throw reported that his symptoms were often precipitated by emotional stress. [AR[3] 272]. The cardiology records note that Mr. Throw was first treated for recurrent atrial fibrillation in 2005, and was still taking medication for that condition. An EKG was done with normal findings. Mr. Throw was told to continue on his heart medication and to follow-up with the cardiologist after undergoing an echo doppler and exercise nuclear stress test. [AR 299].

---

[2] Mrs. Throw has standing to bring this action because she is entitled to receive payment of any underpaid benefits to which Mr. Throw would have been entitled. *See* 20 C.F.R. § 404.503(b)(1).

[3] The Administrative Record ["AR"] is found at Docket Entry # 18. The page citations are to the Bates stamp numbers at the lower right corner of each page.

On March 29, 2018, Mr. Throw was seen at the emergency room for a syncopal episode, also known as fainting or losing consciousness. His wife reported he had been in an altered mental state the previous night and that she witnessed him frothing at the mouth with his eyes rolling to the back of his head. She called EMS, who found him still in a state of confusion when they arrived. His condition improved quickly after that, and Mr. Throw declined to go to the hospital. However, Mr. Throw awoke the next morning with severe chest pain and shortness of breath. He also felt clammy and diaphoretic. Because the pain was very severe and did not go away, his wife drove him to the ER for further evaluation. [AR 295, 305, 329].

At the ER, Mr. Throw complained of a stabbing discomfort in his chest that came and went, with nausea, headache, and shortness of breath. He also reported chest tightness, palpitations, inability to breathe normal, and generalized weakness. He was admitted to the hospital and a cardiologist was consulted. Telemetry showed some bradycardia,[4] but Mr. Throw was asymptomatic, meaning he did not have subjective increased chest discomfort with some of the episodes of bradycardia. Further testing, including laboratory studies, chest x-ray, and EKG, did not show any signs of an acute ischemic event. Based on the clinical history of syncope, it was hypothesized that Mr. Throw had a seizure, but a CT scan of the head was negative for stroke, aneurysm, tumor, or bleeding. Mr. Throw was discharged with the recommendation that he decrease the dosage of his heart medication and obtain a neurology

---

[4] Bradycardia refers to a slower-than-expected heart rate, which can have causes that are not due to any underlying disease. For example, it may be due to a family history of slow heart rate, high level of fitness, meditative breathing, sleep, or medication side effects. *See https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474* (last visited September 27, 2022).

consult and EEG if another syncope episode occurred. [AR 295, 305-308, 330, 335, 365-369, 372, 596, 992].

On or about July 10, 2018, Mr. Throw had another syncope episode. He sat down to eat when he "suddenly passed out, and his head actually fell in the bowl." [AR 372]. When he regained consciousness, he was confused and unbalanced. His wife got him into the car and drove him to the hospital, "but he … was yelling and screaming and ran away." [*Id.*; *see also* AR 365 (he was "at the fair and passed out and when wife took him to hospital he jumped out of car and tr[ied] to climb a house"); AR 596, 992 (similar)].

Mr. Throw was seen the next week, on July 17, 2018,[5] at the emergency room and referred to Dr. Sammi M. Dali for a cardiology consultation. [AR 365, 372]. Mr. Throw reported to Dr. Dali that he had been having events of passing out for 30-60 seconds at a time. The only warning sign would be tiredness and a heavy feeling in his eyes. He also would feel his heart start to beat slower, but he would not realize that he had passed out.  He wakes up confused and sometimes diaphoretic. Mr. Throw told Dr. Dali about what had happened the week before at the fair, as well as the episode in March, and explained that the reason his wife brought him to the hospital at that time was that he had had four back-to-back syncope events that day alone. He was in bed and talking to his wife when the first event happened. He suddenly became quiet and nonresponsive, and his wife checked his heartrate, which was very slow. When he regained consciousness, he was pale, sweaty, and confused, and asked his wife "who are you?" The second event occurred 20 minutes later, while he was still in bed. He passed out

---

[5] July 17, 2018 is the declared onset date of Mr. Throw's disability, and also the date on which he reportedly stopped working.

for about 30 seconds, and when he woke up he was talking about his mother. The third event was about 90 minutes later. He was talking to his wife, and he passed out for about 45 seconds and then woke up and was confused before going back to normal. His wife wondered whether the episodes were neurologic or cardiac-related. [AR 356, 365-366, 372, 596, 992].

Dr. Dali performed a cardiac workup, including a CT scan, an echocardiogram, and an EEG, all with normal results. Mr. Throw was diagnosed with syncope, with a differential diagnosis of arrhythmia, dehydration, symptomatic bradycardia, and fatigue, and he was given an implantable loop recorder so that his heart rhythm could be monitored remotely. Mr. Throw was discharged with plans for a pacemaker to be implanted for treatment of atrial fibrillation. [AR 369, 452, 460, 571, 992].

In a follow-up appointment with the cardiac nurse practitioner on August 2, 2018, Mr. Throw reported that he had been told to stop taking his heart medication due to the bradycardia; "however he has noticed 'I'm going into Afib all the time and feel better with it.'" His "wife reported concern because she feels he is developing worsening symptoms since [his] hospital discharge," with confusion, dizziness, nausea, bloody nose, and what the nurse described as "sun downers like symptoms at night." About three weeks later, on August 20, 2018, Mr. Throw had the loop recorder removed and a pacemaker implanted. In a follow-up visit on August 28, 2018, Mr. Throw reported that, "since the pacemaker he has noticed his heart racing more and he is becoming more short of breath and fatigued." He also reported that he was back on the heart medication at a higher dose since his hospital discharge. [AR 416, 536, 550, 560, 573].

Mr. Throw filed his DIB application on September 9, 2018, shortly after he received the pacemaker. His application alleged disability based on physical impairments only, including

5

atrial fibrillation, syncope, hypertension, asthma, angina, sleep apnea, bradycardia, tachycardia, and vertigo. In an October 2, 2018 Function Report, Mr. Throw wrote that he suffered from erratic sleep and irregular nighttime breathing patterns. [AR 196; *see also* AR 201 (stating in response to whether he had noticed any unusual behaviors or fears, "nightmares/wandering off")]. He also reported that he needed special reminders to bath regularly and sometimes forgot when he last took a shower; that he needed help making sure he was taking the correct dosages for all his medications; and that he did not prepare his own meals because he would leave food out afterwards, forget he had prepared food and not eat it, and, on several occasions, had even forgotten to turn the gas off on the stove. He also reported that he did not go out alone because sometimes he would walk away without telling anyone; that he did not drive because he had fainting spells; that he could go out shopping but he usually needed help; and that he had difficulty with his finances because he would over-pay his bills without realizing it. He also reported that he enjoyed reading but sometimes forgot what he had just read. Mr. Throw reported that he got along well with authority figures, but that he sometimes became overwhelmed with people and that interacting caused stress, which he did not handle well. He reported that he could handle changes in routine so long as he was given time to adjust.

In a follow-up appointment with Dr. Dali on November 15, 2018 to check on the pacemaker, Mr. Throw reported that he had been feeling more tired, but with no anginal chest pain, heart palpitations, or dizziness. Mr. Throw's wife, however, reported that he was still "passing out" about twice a day. His "eyes would 'turn red' and he would stop answering." The episodes occurred when he was sitting down or walking and lasted for two minutes. Dr. Dali wrote that Mr. Throw needed a neurology consultation. On December 14, 2018, in another cardiology follow-up appointment, Mr. Throw reported to Dr. Dali that he had been having a

sharp left-side cardiac pain unrelated to any movement, lasting about 15 minutes. He reported that his last syncopal episode was four weeks earlier. [AR 555, 558, 559, 602, 607].

In January 2019, an agency examiner at the initial level found Mr. Throw not disabled based on Mr. Throw's allegations regarding physical impairments only. The RFC findings in the agency reviewer's report dealt primarily with Mr. Throw's alleged symptoms of chest pain at the pacemaker site and syncopal episodes that were presumed to have been caused by his physical impairments. Following the initial review denial, on March 26, 2019, Mr. Throw was asked as part of an agency field report whether he had any new impairments. Mr. Throw again reported only physical impairments. But his reported symptoms included difficulty falling and staying asleep and increased daytime tiredness and fatigue.

On April 18, 2019, Mr. Throw was seen at the emergency room, with his wife reporting that he had been suffering from an "altered mental status" for the past three days, similar to the previous episodes of confusion and forgetfulness he had been experiencing intermittently since the previous June. Mr. Throw's wife also reported that "he has been having chest pain," and she was worried that his pacemaker might be "malfunctioning." The emergency room physician noted that Mr. Throw was "acting strange and saying random things," and that he was not participating with his wife in reporting his history. Testing later confirmed that Mr. Throw was intoxicated. When Mr. Throw's wife was informed of the diagnosis, she expressed "shock[]" and "report[ed] that he does not drink alcohol." Mr. Throw also denied alcohol use. He "became very upset" at the diagnosis, demanded that the nurse remove his IV fluid line, got dressed, and walked out. [AR 999, 1003].

On April 25, 2019, Mr. Throw was seen for the first time by a new primary care physician, Dr. Faiz Khan. Mr. Throw reported to Dr. Khan that he was suffering from anxiety,

excessive worry, fatigue, irritability, nervousness, panic attacks, shaky hands, sweaty palms, and sleep disruption. He described the onset of these symptoms as being gradual over the past two years, with no known event that preceded them. He said the symptoms occurred frequently, were of moderate severity, and were worsening, and that associated symptoms included dizziness, fainting, and heart palpitations. Mr. Throw told Dr. Khan that he had seen a neurologist when hospitalized previously for what his wife thought might be seizures. Despite negative neurological findings at that time, he was still having attacks of sudden fainting or passing out. A "History & Physical Report" in the treatment notes indicate Mr. Throw's medical issues included "Generalized anxiety disorder, Seizure-like activity, Atrial fibrillation, Essential hypertension, COPD, and Diabetes mellitus and lipid screening." Dr. Khan prescribed Zoloft[6] , and recommended that Mr. Throw consult with a neurologist "for further management and evaluation" of the syncope episodes, and, if needed, for referral to a "tertiary care center[7]." [AR 988-989].

Mr. Throw saw his cardiologist, Dr. Dali, on May 6, 2019, at which time he reported that the syncope episodes were still happening, although less often. He reported that the occurrence of an episode had no relation to time, place, or the activity in which he was engaged, and that the most recent episode was on April 29, 2019. He was lying in bed with the lights dimmed and television on when his eyes got heavy and he dozed off for 45 seconds to a minute.

---

[6] Zoloft (sertraline) is a selective serotonin reuptake inhibitor (SSRI) used to treat depression, bipolar disorder, panic attacks, obsessive compulsive disorder, posttraumatic stress disorder, and social anxiety disorder. *See https://www.webmd.com/drugs/2/drug-35/zoloft-oral/details/list-conditions* (last visited September 27, 2022).

[7] Tertiary care is a level of health care obtained from specialists in a large hospital after referral from providers of primary and secondary care.

He woke up scared and not knowing what had happened to him. Mr. Throw told Dr. Dali that he had been under a lot of stress for the last three to four years over his divorce and child custody issues, and that stress made the episodes happen more often. [AR 596-597].

Mr. Throw saw a neurologist, Dr. Nasar Katariwala, on May 7, 2019, at which time he reported the continuing episodes of syncope occurring approximately once every three days, each lasting from 15 seconds to two minutes in duration, with Mr. Throw waking up feeling tired and unaware that the episode had occurred. Dr. Katariwala noted that Mr. Throw had been diagnosed with an anxiety disorder. A "Review of Systems" indicated normal "Neurological" and "Psychiatric" findings. Dr. Katariwala reviewed testing done previously in March and July 2018, including: (1) an EEG ("normal record in waking only without any drowsiness or stage II normal sleep, persistent bradycardia without any malignant arrhythmia seen; clinical correlation suggested"); (2) Echocardiogram (normal findings); (3) CT Scan of head (no acute intracranial process); (4) Loop recorder (sinus rhythm with premature beats and ectopic rhythm). For his "Assessment," Dr. Katariwala wrote: "Syncope vs. Psychogenic syncope???" [AR 996]. Psychogenic syncope is "an involuntary reaction of the brain to pressure and distress," which presents as "the appearance of transient loss of consciousness in the absence of true loss of consciousness," often the result of underlying stress and anxiety.[8] Dr. Katariwala's treatment plan was to "perform a 3-day ambulatory EEG in [his] office to

---

[8] See https://pubmed.ncbi.nlm.nih.gov/24882462 ("Psychiatrically, most cases [of psychogenic pseudosyncope] are classified as conversion disorder, which is hypothesized to represent the physical manifestation of internal stressors." (last visited September 27, 2022)); https://heartrhythmalliance. org/stars/uk/psychogenic-blackouts ("A psychogenic blackout can be difficult to diagnose. … In exceptional cases, it may be [seen in] … some people [who] have experienced ill treatment or abuse in childhood." (last visited September 27, 2022)).

further clarify the episodes the patient experiences. The record contains no indication that any follow-up or further treatment by Dr. Katariwala occurred.[9] [AR 992-996].

On May 8, 2019, Mr. Throw saw his treating pulmonary specialist, Dr. Ndukwu. He reported the syncope episodes to Dr. Ndukwu, and said that his primary care physician, Dr. Kahn, and his cardiologist, Dr. Dali, were investigating the cause. Dr. Ndukwu wrote that, although Mr. Throw's COPD was doing better, he was experiencing syncopal or near syncopal episodes of "uncertain etiology" and that his family doctor and cardiologist were working to find a cause. Dr. Ndukwu also wrote that obstructive sleep apnea and/or central sleep apnea could be the cause of cardiac arrythmia and a contributing factor to syncope. [AR 594-595].

Also on May 8, 2019, Mr. Throw completed a Function Report for his disability application, in which he reported symptoms and limitations similar to those described in the September 2018 Function Report, such as needing reminders for hygiene and medication. He also reported that he was still unable to go places by himself or drive due to frequent syncope and occasional confusion, which posed safety issues. Mr. Throw described an escalating cycle of having memory problems, becoming anxious, feeling confused, and being unable to complete tasks. He said that he could pay attention for less than one-half hour, described his ability to tolerate stress as "not well at all, causes severe anxiety," and said that he was not able to tolerate changes in his routine either. For the first time, Mr. Throw also described feelings of paranoia stating, "I feel like everyone is out to get me or against me." [AR 221].

---

[9] A possible reason shown in the record is an insurance issue. *See* [AR 595 (he had been unable to undergo a sleep study due to insurance issues).

On May 9, 2019, Mr. Throw had a follow-up appointment with Dr. Kahn, at which time he reported that "overall things are going a little better," and that the medication was helping. Nevertheless, Dr. Kahn increased the dosage for Mr. Throw's anxiety medication. [AR 986-987].

Mr. Throw first sought help from a mental health professional in July 2019. He was seen at that time by Carol Chase, a Licensed Mental Health Counselor, who was working under the supervision of a clinical psychologist, Dr. Thomas M. Allen. Mr. Throw reported in his intake questionnaire that he had been experiencing depression and anxiety for about a year. He described his depression and anxiety as moderately severe, and listed a plethora of symptoms.[10] [AR 895, 903, 906, 911, 916].

On July 2, 2019, Ms. Chase prepared a Diagnostic Assessment Report, stating that Mr. Throw "presents to initial assessment with complaints of severe mood changes, anger, [and] nightmares that continue to distress him during the day." His nightmares "wake him in terror," and he "has memories of his very abusive childhood." His wife reported that he was "extremely depressed," that "[h]e cries and has no joy," and that, "in the evening he begins to be more confused and think about the past." "At night, he has nightmares where he yells and thrashes"; he sleepwalks; and "[s]he is afraid to leave him even during the day." Ms. Chase wrote: "Th[e]

---

[10] *See* [AR 908 ("crying spells, feelings easily hurt, lacking in confidence, feeling grouchy, always tired, poor appetite, depressed, trouble sleeping, feeling lonely, not enjoying things, suicidal thoughts, feeling inferior, worried about health, can't concentrate, can't 'get going,' feeling angry, don't like being alone, lack energy, fast heartbeat, frequent sweating, dizziness, shaky hands, nightmares, feeling panicky, diarrhea, shy with people, muscle twitching, nausea or vomiting, headaches, fainting spells, unable to relax, feeling fearful, overly sensitive, anxious inside, money problems, can't hold job, problems with parents, full of energy, easily excited, quick tempered, impatient with people, very restless, feeling like hurting someone")].

client indicates something like dissociation and personality change. He is aware of his change but doesn't clearly know what is happening." She also noted that he "has thought about suicide often. He doesn't have a plan but he is desperate. He insists that he will not do it, but his wife is always afraid, she says. For this reason, they are looking into Rogers Behavioral Health for residential mental health treatment." Ms. Chase recommended a referral "to Dr. Allen for psych testing," and to "[r]ule out [n]eurological cause." A Treatment Plan prepared by Ms. Chase and cosigned by Dr. Allen diagnosed Mr. Throw with (1) Adjustment Disorder with Mixed Disturbance of Emotions and Conduct[11]; (2) Posttraumatic Stress Syndrome (PTSD); and (3) Nightmare Disorder. [AR 892, 895-897, 900].

Following her initial evaluation, Ms. Chase saw Mr. Throw for therapy sessions on July 11, 18, and 30, 2019. Mr. Throw reported in these sessions that his nightmares were debilitating, that he was afraid to go to sleep, and that his problems with anger, nightmares, and social anxiety all began when he got the pacemaker. Ms. Chase noted Mr. Throw experienced episodes of depersonalization or dissociation along with having audio and visual hallucinations. By the final July session, Mr. Throw reported that he had learned a breathing method to calm himself and that his nightmares continued but were not as violent. He stated that he knew he could not drive because he did not trust himself, he was afraid to be in public with people he did not know, but he was feeling more secure at home. [AR 894, 887, 897].

---

[11] An "adjustment disorder with mixed disturbance of emotions and conduct" is a disorder "marked by 'clinically significant emotional or behavioral symptoms' of both depression and conduct disturbances such as 'violation of the rights of others or of major age-appropriate social norms and rules.'" *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 692 (7th Cir. 2016) (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 679–80 (4th ed. text revision 2000)).

On July 30, 2019, Ms. Chase wrote a letter addressed to the "Disability Determination Bureau," in which she stated that Mr. Throw had "severe Nightmare Disorder that impacts his day almost every day." [AR 885 (Exhibit 14F)]. She described the nightmares as "surreal situations at first glance that are not like any situations that he has experienced," and caused Mr. Throw to be "confused, and obsessed about them and their origin." The nightmares also made Mr. Throw "tired during the day after thrashing and yelling and sleep walking." Ms. Chase said that Mr. Throw had a difficult childhood with one parent who was absent and the other who "was neglectful and emotionally abusive to the extent that [his] struggle[ ] with his human identity makes it impossible for him to find value in himself." She described Mr. Throw as being "tearful and sad," and, beyond that, "suicidal," stating he was being treated for suicide ideation. She concluded the letter by stating that Mr. Throw "is gaining some hope but is unable to work." She further reported that "[h]is concentration and decision making is compromised by his PTSD and his Nightmare disorder," and that "[h]e would be a danger to himself and others at certain jobs that require physical and mental ability," explaining that "[h]e sometimes dissociates and does not remember what he just did." Mr. Throw stopped seeing Ms. Chase at the end of July 2019 because insurance would not cover the treatment. [AR 1047, 1049, 1050, 1059].

Mr. Throw's mental health issues were first considered by the SSA in September 2019 during reconsideration review. The agency psychological examiner reviewed Ms. Chase's July 30, 2019 letter and treatment records from July 2-30, 2019. The examiner found that the limitations noted in Ms. Chase's letter were "not consistent with functioning reported by cl[aimant]," and that the "MER [Medical Evidence of Record] notes no current SI [suicidal ideation]" but "suggests syncope; atypical reports of symptoms with (lack of) seeking

13

treatment." The reviewer also noted that Ms. Chase had "[r]eference[d] referral to Thomas

Allen for neuropsych eval[uation]" but that the referenced evaluation had not been received.

The examiner then stated as follows:

> Cl[aimant] is not responding to attempts to contact regarding
> referral to neuropsych[ological] eval[uation]. Either the
> neuropsych[ological] eval[uation] or Ce [consultative
> examination]/MSE [mental status examination] is needed to
> evaluate the claim. At this time due to FTC the decision is IE.

[AR 98]. The SSA Program Operations Manual System ("POMS") explains that "FTC refers

to an individual's failure, without good cause, to do by a certain date what SSA or the DDS has

asked," by (1) not "provid[ing] medical or other evidence," (2) not "attend[ing] a scheduled

consultative examination (CE)," or (3) not "tak[ing] the required action which SSA or DDS has

requested."[12] "IE" may refer to a determination that, "at this time," Mr. Throw was ineligible

for benefits based on the fact that "no mental medically determinable impairments had been

established" due to the absence of any medical opinion from a treating source or consultative

psychological examination in the record and/or due to the "FTC" finding.[13]

  On October 14, 2019, Mr. Throw saw his primary care physician, Dr. Khan as a follow-

up to having been diagnosed by Carol Chase with PTSD, depression, nightmare disorder, and

---

[12] POMS, DI 28075.005, *Failure to Cooperate (FTC) and Whereabouts Unknown (WU) During a Medical Continuing Disability Review (CDR),* available at *https://secure.ssa.gov/poms.nsf/lnx/0428075005* (last visited September 27, 2022).

[13] There is no evidence in the record that Dr. Allen ever conducted the neuropsychological evaluation that Ms. Chase mentioned she was going to recommend, or that Mr. Throw refused to provide any medical evidence or attend any examination at the agency's request. There is also no evidence that the agency ever sought a consultative examination to evaluate Mr. Throw's mental status or reevaluated the "IE" finding, and from what the Court can tell, the ALJ did not consider or apply the "FTC" and "IE" findings in her analysis.

bipolar disorder. Mr. Throw reported to Dr. Khan that the anxiety medication was not working for him anymore, and that he "ha[d] been hallucinating more in the last 3 months, fighting people that aren't there." Mr. Throw's wife was present and "state[d] that the mood disorder hits him about sundown, worsening in the past 3 months." Dr. Khan noted that Mr. Throw's eye contact was "very poor," although his mood was stable, his thoughts intact, and his speech "fluent and articulate." Dr. Khan reviewed Ms. Chase's evaluation of Mr. Throw's mental health status, noting it had been prepared under the supervision of Dr. Allen, and wrote for his assessment that Mr. Throw had a history of PTSD and nightmares disorder, that the "ongoing mood problems/disorder is associated with auditory and visual hallucinations," and that the "differential of this condition is schizophrenia[14] and bipolar disorder[15] with delusions, manic episode of bipolar disorder with delusion." In light of these mental health diagnoses, Dr. Khan noted that Mr. Throw needed to be "evaluat[ed] and manage[d] under [the] care of [a] psychiatrist." Dr. Khan gave Mr. Throw samples of Vraylar[16] to provide "immediate

---

[14] "Schizophrenia is a serious mental disorder in which people interpret reality abnormally. Schizophrenia may result in some combination of hallucinations, delusions, and extremely disordered thinking and behavior that impairs daily functioning, and can be disabling." *https://www.mayoclinic.org/diseases-conditions/schizophrenia/symptoms-causes/syc-20354443#:~:text=Schizophrenia%20is%20a%20serious%20mental,functioning%2C%20and%20can%20be%20disabling* (last visited September 27, 2022).

[15] Bipolar disorder is a mental disorder that causes episodes of mania, episodes of depression and other abnormal moods. *See https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/ symptoms-causes/syc-20355955* (last visited September 27, 2022).

[16] Vraylar (cariprazine) is an atypical antipsychotic used to treat schizophrenia. *See https://www.vraylar.com/* (last visited September 27, 2022); *https://medlineplus.gov/ druginfo/meds/ a615050.html* (last visited September 27, 2022).

[symptom] management," and referred him to the Porter Stark Behavioral Health Center. [AR 947-949].

Mr. Throw next visited Dr. Khan two weeks later, on October 28, 2019. When asked how he felt, Mr. Throw reported that it was "hard to say," and that, although he had not had any adverse reactions to the new medication, "neither did [he feel] any benefit" at that time. Mr. Throw also reported that he had scheduled a psychiatric appointment at Porter Starke. [AR 949]. Mr. Throw completed registration documents for Porter Starke Services on October 30, 2019, reporting that he had been diagnosed with schizophrenia by Dr. Khan, and that he was having issues with visual hallucinations and not knowing what he was doing throughout the day, with moods that fluctuated from happy, to sad, to angry. [AR 1052-1055].

Mr. Throw returned for a two-week follow-up with Dr. Khan on November 11, 2019, at which time he reported that he was "seeing and hearing things more often, shaking, sweating and clammy." Although he reported that his mood was "a lot better," he also said that he was only sleeping about four hours. Dr. Khan wrote that Mr. Throw felt the status of his conditions was "[b]etter, but he is having some side effects." Dr. Khan noted that Mr. Throw did not mention having nightmares that day, but, from past sessions, "[t]hese dreams are terrifying as he described in nature from his past, some … from [his] childhood." Although he observed that Mr. Throw was "alert" with appropriate mood and affect and no showing of sadness or tearfulness, Dr. Khan "confirmed" Mr. Throw's active diagnoses of bipolar disorder,

generalized anxiety disorder, and schizophrenia, and added Risperdal[17] to his medications to treat the hallucinations and schizophrenia. [AR 936-942].

Following the agency's denial of his DIB application at the reconsideration level, Mr. Throw completed a Disability Report on November 20, 2019, in which he informed the agency of his recent mental health diagnoses, and, in particular, that he had been diagnosed with schizophrenia and bipolar disorder and was experiencing visual and auditory hallucinations. He also reported changes in his daily activities, including frequent insomnia, hallucinations, and "hearing and seeing people/objects that aren't there." [AR 223-230].

On December 19, 2019, Mr. Throw again saw Dr. Kahn, and reported that he was still having bad nightmares and was "on edge[], agitated, [and] ha[d] some sadness." He also told Dr. Khan about a couple of nights where he woke up in a different room and did not know how he got there. He said he was still having hallucinations and hearing voices but they were not as severe as before, reporting they were "70% better." Dr. Khan described Mr. Throw's bipolar as "chronic but stable," with on-going "auditory and visual hallucinations from schizophrenia." Mr. Throw's appointment with the psychiatrist was not for another few weeks, so Dr. Khan increased the dosage of Mr. Throw's psychiatric medications in the meantime. [AR 966-967].

Mr. Throw was seen by psychiatrist Anand Popli on January 8, 2020. Dr. Popli's initial psychiatric evaluation reports that Mr. Throw described a bad childhood, involving a severe alcoholic father, mental abuse by both parents ("[t]hey played mind games and did a lot of lying"), some physical abuse, and abandonment. He graduated from high school and became a

---

[17] Risperdal (risperidone) is an atypical antipsychotic used to treat schizophrenia, episodes of mania or mixed episodes in bipolar disorder, and aggression, self-injury, and sudden mood changes in autism. *See https://www.drugs.com/risperdal.html* (last visited September 27, 2022).

bricklayer, which he claims gave him COPD and emphysema. He reported that he never smoked or used illegal drugs and only very occasionally used alcohol. Mr. Throw's wife attended the session with Mr. Throw, and they both stated that he was fine until July 2018. On that day, "he was at the county fair, and he was acting loopy as if he was drunk. He then had what they described as twitching and fell on the ground. His mouth was foaming. While he was being taken to the hospital, he jumped out of the car." Mr. Throw stated that his life has been stressful in that he had not been able to work since the July incident. He reported a total of seven past seizures where he would lay on the floor with arms flaying, eyes rolling, mouth foaming, with the last one in October 2019. [AR 1049-1050].

Dr. Popli wrote that it was unclear when Mr. Throw started having the hallucinations, but "[h]e apparently has had periods where he talks to people in the room and has conversations particularly with a deceased friend, David. He states he can see David as he was when he was 12 years old wearing his silly cap. He also talks to his grandfather who is deceased or his brother." In addition to hallucinations, Mr. Throw reported moods swings, "going from feeling good to feeling quite paranoid." He reported feeling that there were video cameras outside, that his ex-wife was sending people to the house, and that people were staring at him. Mr. Throw described two prior suicide attempts. The first was when he was 12 years old, after his best friend, David, died in an accident. He had his stomach pumped at the hospital but did not receive any psychiatric treatment at that time. "More recently he attempted an overdose after he was feeling overwhelmed due to not being able to see his kids, problem with his brother having an addiction and going to rehab, and not being able to return to work due to having a pacemaker." "This time he slept it off and did not seek any [medical] attention." He denied being suicidal at that time, but "does question how he could be a burden on others." [AR 1049-1051].

18

Mr. Throw told Dr. Popli that he suffered from fatigue, night sweats, vertigo, headache, seizures, memory loss, hallucinations, disorientation, and problems with balance and coordination. Dr. Popli described Mr. Throw's mood as sluggish, his affect as "including a mood component," and his speech as slightly rapid at times. Dr. Popli also found that Mr. Throw had difficulty with 3-object recall and on 2 separate occasions could recall 2 out of 3 but not all 3 items. Dr. Popli assessed Mr. Throw with a PHQ-9 score of 23, indicating severe depression,[18] and a GAD-7 score of 19, indicating severe anxiety,[19] with a CAGE score of 0 out of 4, indicating no substance abuse disorder[20]. Dr. Popli reported that he did not think Mr. Throw's symptoms were consistent with schizophrenia. Instead, he thought Mr. Throw had "trauma-related issues and a psychotic presentation with possible mood disorder," which, "[f]or now," he was calling "Bipolar Disorder, Other Specified with Psychosis."  He added that

---

[18] The Patient Health Questionnaire (PHQ) is a diagnostic instrument for depression. PHQ-9 scores of 5, 10, 15, and 20 represented mild, moderate, moderately severe, and severe depression, respectively.  *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/*  (last visited September 27, 2022); *see Sellers v. Saul*, No. 4:17-CV-67-HAB, 2019 WL 3928711, at *3 (N.D. Ind. Aug. 20, 2019) (PHQ-9 "scores of greater than or equal to 10 indicate 'likely major depression.'").

[19] GAD-7 is a clinical tool for screening for generalized anxiety disorder ("GAD") and assessing its severity, with a GAD-7 score of 10 or greater indicating the presence of the disorder. *See https://pubmed.ncbi.nlm.nih.gov/16717171/* (last visited September 27, 2022). A GAD-7 score of 15-21 represents severe levels of anxiety. *See, e.g., Wendy B. v. Saul*, No. 20-CV-00687 MSK/BRT, 2021 WL 6231425, at *5 n.6 (D. Minn. Mar. 11, 2021) (citing *https://jamanetwork.com/journals/  jamainternalmedicine/fullarticle/410326*); *Ford v. Berryhill*, No. 17-CV-544-WMC, 2019 WL 11594537, at *3 n.5 (W.D. Wis. June 4, 2019) (citing *https://adaa.org/sites/default/files/GAD-7_Anxiety-updated_0.pdf* (last visited June 3, 2019)).

[20] CAGE is a 4-question screening device to assess whether an adult suffers from an alcohol or other substance abuse problem. Two positive responses are considered a positive test and indicate further assessment is warranted. *See https://pubs.niaaa.nih.gov/publications/arh28-2/78-79.htm* (last visited September 27, 2022).

"[t]here may be underlying Posttraumatic Stress Disorder-like symptoms, but he currently [was] not endorsing clear significant Posttraumatic Stress Disorder phenomenon and symptomatology." Dr. Popli intended to review Mr. Throw's past CT scan and EEG, and if he still had doubts, he planned to refer Mr. Throw for more neuropsychological testing. He noted that Mr. Throw was at risk for neurologic side effects with the medicines he was on, and he therefore discontinued Vraylar but continued Mr. Throw on Risperdal and continued and increased Mr. Throw's dosage of Zoloft. Dr. Popli ended his evaluation with a "guarded" prognosis. [AR 1050-1051].

Mr. Throw had a follow-up appointment with Dr. Khan, his primary care physician, on January 20, 2020, at which time he reported that his medications seemed to be working well for him. The treatment notes indicate that his overall condition was stable and well-controlled, and mental status examination was normal. [AR 960-961].

Mr. Throw had a follow-up appointment with Dr. Popli on February 5, 2020. During the appointment, Mr. Throw described drastic mood changes with very high periods, when he felt on edge and irritable and reported taking on many activities and doing strange things, alternating with low periods where he felt depressed and hopeless. Mr. Throw continued to report paranoia, triggered for instance by getting messages or calls from unidentified numbers on his phone, so he had his number changed that day. He reported that he continued to see his grandfather and David and had conversations with them. He endorsed depressive symptoms with little interest, feeling down, appetite changes with weight gain, and trouble concentrating, but denied any thoughts of wanting to hurt himself. For his mental status examination, Dr. Popli found Mr. Throw had a dysphoric affect and sad mood; was "easily tearful" in general appearance; showed poor insight; and displayed disturbances or abnormalities of perception

(visual hallucinations), thought content (paranoia and ideas of reference), and thought process (illogical thinking). Dr. Popli also commented that Mr. Throw was "focused a lot on his visual hallucinations, and displayed mood changes and irritability," although Dr. Popli did not observe any suicidal or homicidal ideation or plans at that time. Dr. Popli's assessment was that "[t]rauma-related issues could be playing a role in [Mr. Throw's] visual hallucinations as they are related to losing his best friend and grandfather"; that Mr. Throw's "[i]rritable mood changes" were consistent with bipolar disorder; and that "diagnostically it appears that PTSD may be a factor." Dr. Popli diagnosed Mr. Throw with "Unspecified Bipolar and Related Disorder" and well as "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder." He noted that he was still waiting for records of Mr. Throw's prior CT and MRI scans. He increased Mr. Throw's dosage of Zoloft, continued the Risperdal at the same level ("already higher than [a] typical dose"), and, to help with Mr. Throw's nightmares, added a new prescription for prazosin.[21] [AR 1039-1045].

A little over a month after the February session with Dr. Popli, on March 19, 2020, Mr. Throw came home with blood on his face and was acting like he was in an altered state. Emergency personnel were called to the house, as well as the police because Mr. Throw was trying to drive off. Mr. Throw reported that he had been in a fight at the gas station and was hit

---

[21] Prazosin belongs to a class of medicines called antihypertensives, which are prescribed to treat high blood pressure (hypertension) and work by relaxing the blood vessels so that blood passes through them more easily. *See https://www.mayoclinic.org/drugs-supplements/prazosin-oral-route/side-effects/drg-20065617?p=1* (last visited September 24, 2022). According to the National Library of Medicines, there is evidence to support the notion that prazosin is effective for PTSD nightmares. The nightmares, however, "often do not resolve completely on a low dose of prazosin," but "[c]linicians are reluctant to increase the dose … due to side effect concerns." *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3896131/* (last visited September 24, 2022).

on the left side of his face. Hospital records indicate that Mr. Throw was diagnosed with alcohol intoxication delirium. The records also note that Mr. Throw had a significant past medical history of bipolar disorder and schizophrenia, that he presented with an altered mental state and confusion, and that he could not recall what city or state he was in or what month or year it was. The hospital records report as the "primary impression" that Mr. Throw had a "behavioral/psychiatric disorder." [AR 1068-1069, 1072, 1088]. Mr. Throw's wife called Dr. Popli's office while Mr. Throw was in the hospital to report what was happening, saying that Mr. Throw was very suicidal and that she was trying to find a place for him to be admitted when he was discharged from the hospital. She reported that Mr. Throw had been consuming alcohol daily for the past six months, and worried he would be suffering from alcohol withdrawal once he was released. Dr. Popli advised Mrs. Throw to tell the emergency room about these concerns because they had a psychiatric inpatient unit and a hospital to handle alcohol withdrawal. Emergency room records show that Mrs. Throw expressed her desire to get Mr. Throw admitted to an inpatient alcohol rehabilitation facility, but that Mr. Throw was discharged to home instead because he could not be admitted until he was sober and agreeable to it. [AR 1038, 1072].

On May 6, 2020, Mr. Throw had a telehealth appointment with Dr. Popli due to the national emergency caused by the COVID–19 virus. He stated at that time that he was "doing better," indicating that "mild agitation is not there," the nightmares had "gone away," and he had not been seeing his grandfather or friend David. He also reported that he had not been seeing his therapist since the COVID–19 pandemic had started. Mr. Throw did not see Dr. Popli again between this date and the disability hearing in August 2020. He did have an appointment with Dr. Kahn on July 14, 2020, just before the ALJ hearing on August 3, 2020. Dr. Kahn's

treatment notes indicate that Mr. Throw's auditory and visual hallucinations had been "remarkably reduced" and his mood was "much [more] stable from medications." [AR 1057, 1094].

###### C.   HEARING TESTIMONY

Mr. Throw appeared and testified at an administrative hearing held by telephone on August 3, 2020. He testified to his employment history, which included jobs as a furniture delivery assistant manager, delivery driver, meat packager, property inspector, lumber sales representative, and bricklayer. His most recent employment was at a bakery facility, where he packaged loaves of bread as they came off the production line, put the packages in boxes, and stacked the boxes for delivery. Mr. Throw stopped working at the bakery in July 2018, when he got the pacemaker.

When asked why he had been unable to work since July 2018, Mr. Throw responded that his heart "just gave out," he had to have a pacemaker put in, and his health "just [went] downhill ever since." He explained that the doctors were having difficulties getting his medications right in order to get "the pacemaker and atrial fibrillation to work together," and complained of not knowing whether his symptoms such as chest pain and shortness of breath were from his COPD, anxiety, or something else. He said that he experiences chest pressure, chest pain, and shortness of breath between five and ten times a day. The shortness of breath was severe, where he was sometimes wheezing, tired, and fatigued, and he had to stop and use his inhaler. He experiences these symptoms in extreme heat or cold, or if he is around dust or smoke, but the symptoms are also triggered from excessive walking. For instance, he said he could not walk from the house to the mailbox and back without getting out of breath. And if he has an "episode," it takes a lot out of him. He gets "really, really fatigued, … like [he] ha[sn't]

23

slept in days," and "it's hard to determine … is it the afib or … [something else?]" Mr. Throw also testified that, because of sleep apnea, he does not get normal rest at night, and therefore he has to take two to three naps a day. He testified that he still suffers from syncope episodes, where he closes his eyes for minutes at a time not realizing that is what he has done.

When asked about how his mental health conditions impacted his ability to function, Mr. Throw explained his "whole life has changed." He said that he has dreams at night that he cannot get out of his head, that his anxiety level is "so high it's … unbelievable," that his "actions … are not like they used to be," that he "lack[s] concentration," and that he is "more agitated and irritable." He testified that he has problems being around other people because he worries that somebody is "always out to get [him]," and he has a fear that if he "look[s] over [his] shoulder" he will see "someone's right there … trying to do something." He gets agitated just listening to other people talk, so he prefers to be alone.

Regarding his nightmares, Mr. Throw explained: "I take medication for it, so it[ ] doesn't happen as often as … it did, but [the].. nightmares [I have] at night … are bad. I mean, I just had one the other night where … I woke my wife up [ ] after I had barely [sic] punched her in the throat. … They get bad to [where] I'm swinging in my sleep. I'm constantly [ ] fighting for survival in my dreams." The effects of his nightmares carry over to the next day because, if they are bad, he "might not even make it back to bed for the rest of the night." The ALJ asked Mr. Throw about his report on May 5, 2020 to Dr. Popli that he felt better and that the nightmares have gone away. Mr. Throw testified that report was right after he had been given a medication for the nightmares and it first started working. But the nightmares had eventually returned, just not as severe. He testified that the nightmares started back again about three weeks before the hearing. He had a recent appointment scheduled with Dr. Popli to discuss

the problem but it "didn't take place." Mr. Throw also testified about hearing voices and having hallucinations. As with the nightmares, the medications helped initially, but the symptoms returned in "the last month and a half" where he was talking to himself again. He described it as "nothing really bad … it's just more aggravating than anything" because "half the time, [he] forget[]s about it … [I]t's almost like [he] h[as] memory loss or something." He has problems with focus, concentration, or memory every day. He explained: "[W]ith the amount of sleep that I get at night, and with the meds … I have to take during the day, … everything upstairs is not normal. It's not like the way it should be, and there's times where I forget a ton of stuff. That's why … I don't even cook at the house anymore, because I have a tendency of leaving the stove on after I'm done cooking. Or I'll put something in the microwave, start it, then walk away, and I completely forget that I even put it in there."

The ALJ asked whether alcohol was a problem for him, and Mr. Throw answered that there were one or two times when he had a few drinks at a party or family get-together, and the alcohol may have interacted with his medicines. After that, he said that he stopped attending family parties. The ALJ then asked about a report that he had been using alcohol daily for the six months prior to March 2020, to which Mr. Throw responded: "[A]bsolutely not. … I don't know where that would come from." The ALJ pressed further, asking whether he went to the hospital in March 2020, to which Mr. Throw initially answered "[y]es, but that wasn't for [alcohol use]." But when the ALJ asked about the March 2020 hospitalization a second time, Mr. Throw admitted that he went there for drinking too much, but then added that he "wasn't even in there for an hour." He said the hospital did not provide any treatment, he was released, and he did not seek or receive treatment related to it afterwards. The ALJ asked whether he had seen any doctors between the March 2020 hospitalization and the August 2020 hearing (which

the Court notes was during the COVID-19 pandemic when many businesses were closed and people had reason to not leave their house very much), and Mr. Throw answered that the only appointment he had had in that time period was with Dr. Khan.

### D.   DR. POPLI OPINION

Following the hearing, Dr. Popli provided an opinion supportive of disability. In a Mental Assessment Of Ability To Do Work-Related Activities dated August 31, 2020, Dr. Popli responded to a series of questions regarding Mr. Throw's ability to perform various work-related mental functions. Although the handwriting on the form is difficult to read, as best the Court can tell, Dr. Popli reported as follows:

| Question | Response |
| --- | --- |
| Is he able to follow work rules, relate to co-workers, deal with public, use judgment, interact with supervisors, deal with work related stress, function independently, maintain attention/concentration? | No, currently he is not able to function at home. He claims he cannot walk to the mailbox without getting short of breath. He is really angry, hallucinating. He claims he can't cook & leaves the stove on |
| Able to understand, remember, and carry out job instructions? | No |
| Limitations in ability to have thought organization, memory, intellectual ability and comprehension | Difficulty in concentration & three digit recall. He is having difficulty doing simple tasks at home. |
| Ability to maintain personal appearance | He showers once a week |
| Ability to behave in an emotionally stable manner | He reports breakdowns related to feeling sad or mad |
| Ability to relate predictably in a social manner | When he gets upset he yells |
| Ability to demonstrate reliability | Not able to establish reliability so he lost his last job |
| Ability to make simple work-related decision | Due to unstable thinking and mood |

26

| Ability to respond appropriately to usual work situations | Limited |
|---|---|
| Ability to deal with changes in routine work setting | Limited |
| Ability to respond appropriately to supervisors | Poorly |
| Ability to respond appropriately with co-workers | May get along ok with co-workers |

[AR 1106-1107].

In addition to the above, Dr. Popli opined that Mr. Throw's symptoms were likely to cause him to be off task 25% or more of the workday and to be absent four or more times per month.  Dr. Popli believed Mr. Throw was capable of managing his finances only with the help of his wife. At the end of the report, Dr. Popli wrote that, in his opinion, Mr. Throw was not capable of sustaining work on a continuing basis, explaining that Mr. Throw's "mindset and his physical health would preclude him from being gainfully employed because of the severity of his hallucinations and sleep disturbance and the possibility of him taking actions that he may not recall." In support of this opinion, Dr. Popli noted that Mr. Throw's PHQ-9 score was 19 and his GAD-7 score was 20, indicating severe depression and severe anxiety. Dr. Popli also noted an MMSE score (*see* footnote 52, *infra*) that is difficult to read but appears to be 24/27. [AR 1107].

## FIVE-STEP EVALUATIVE PROCESS

To be eligible for Social Security disability benefits, a claimant must establish that he or she suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that

27

can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether the claimant is disabled. The claimant bears the burden of proving steps one through four, whereas the burden of proof at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At the first step, the ALJ asks whether the claimant has engaged in substantial gainful activity during the claimed period of disability. An affirmative answer at step one results in a finding that the claimant is not disabled and the inquiry ends. If the answer is no, the ALJ moves on to the second step, where the ALJ identifies the claimant's physical or mental impairments, or combination thereof, that are severe. If there are no severe impairments, the claimant is not disabled. If there are, the ALJ determines at the third step whether those severe impairments meet or medically equal the criteria of any presumptively disabling impairment listed in the regulations. An affirmative answer at step three results in a finding of disability and the inquiry ends. Otherwise, the ALJ goes on to determine the claimant's residual functional capacity (RFC), which is "an administrative assessment of what work-related activities an individual can perform despite [her] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). At the fourth step of the inquiry, the ALJ determines whether the claimant is able to perform past relevant work given the claimant's RFC. If the claimant is unable to perform past relevant work, the ALJ determines, at the fifth and final step, whether the claimant is able to perform any work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). A positive answer at step five results in a finding that the claimant is not disabled while a negative answer results in a finding of disability. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R. § 404.1520(a)(4).

28

## THE ALJ'S DECISION

The ALJ made the following relevant findings:[22]

1.     The claimant meets the insured status requirements of the Act through December 31, 2021.

2.     The claimant has not engaged in substantial gainful activity since the alleged disability onset date of July 17, 2018.

3.     The claimant has the following severe impairments: atrial fibrillation, the late effects of arrhythmia status post loop-recorder implantation (syncopal events), a chronic obstructive pulmonary disease (COPD), an obesity, and an affective/anxiety/traumatic disorder complicated by an ethanol (ETOH) abuse disorder. In addition to these severe impairments, the claimant has the non-sever medically determinable impairment of hypertension (HTN). Allegations of a headache disorder, and/or a history of seizures, were found to be "non-medically determinable."

4.     The claimant does not have an impairment or combination of impairments that meet or medically equal the severity of a listing impairment. Listings 4.05, 12.04, 12.06, and 12.15 were considered.

5.     The claimant has the residual functional capacity to perform light work except as the claimant can never climb ladders, ropes, or scaffolds but he can occasionally climb ramps and stairs, kneel, crouch and/or crawl, and frequently balance and/or stoop. The claimant can tolerate occasional exposure to extreme temperatures, humidity, and to pulmonary irritants such as fumes, noxious odors, dusts, mists, gases, and poorly ventilated areas. The claimant must avoid all exposure to hazards such as moving parts or unprotected heights. The claimant is able to understand, remember, and carry out simple and routine tasks. The claimant requires a work environment free of fast paced or time piece production work, but can meet end of day goals. The claimant can perform routine judgment defined as being able to make simple work-related decisions and can tolerate simple workplace changes. The claimant can tolerate occasional, brief

---

[22] The paragraphs listed herein correspond with the paragraphs in the ALJ's decision.

and superficial interaction with the public meaning no more involved interaction than answering discrete questions such as the location of an item in a store. The claimant can tolerate occasional interaction with coworkers, but no tandem tasks or teamwork where on[e] production step is dependent on a prior step.

6.     The claimant is unable to perform any past relevant work.

7-9.     The claimant was 44 years old on the alleged disability onset date, which is defined as a younger individual. The claimant has at least a high school education. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, such as mail clerk, officer helper, and cleaner/polisher.

11.     The claimant has not been under a disability as defined in the Social Security Act from July 17, 2018 through the date of the decision.

*See* [AR 17-26].

## **STANDARD OF REVIEW**

The question before the Court upon judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). Apart from a legal

error, however, the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). The ALJ must articulate an analysis of the evidence to allow the reviewing court to trace the path of reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ also has a basic obligation to develop a full and fair record, and he or she "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## ANALYSIS

In this case, Plaintiff argues that the ALJ committed reversible error by not properly analyzing Mr. Throw's mental impairments.[23] In particular, Plaintiff argues that "[t]he ALJ's conclusions about Mr. Throw's mental impairments do not meet the requirements of the special technique described in 20 C.F.R. § 404.1520a," and that the errors in the ALJ's use of the special technique "are evident with her Step Two findings, resurface in the Step Three analysis, and culminate in a residual functional capacity (RFC) finding that does not take into account all the limitations caused by the combined effects of all of Mr. Throw's several distinct mental

---

[23] Plaintiff does not challenge the ALJ's findings regarding Mr. Throw's physical impairments.

impairments (along with his physical ailments)." [DE 17 at 10, 11]. Plaintiff also contends that the ALJ erred in her evaluation of Dr. Popli's medical opinion. [*Id.* at 17-21]. As discussed below, the Court agrees with Plaintiff's arguments.

### A. STEP 2

The ALJ found at step two of the evaluative process that Mr. Throw had a severe medically determinable mental impairment. This finding is supported by the record, which shows that Mr. Throw was consistently diagnosed with the following: (1) Mr. Throw's therapist, Carol Chase, diagnosed him with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, PTSD, and Nightmare Disorder, and these diagnoses were approved by the supervising psychologist, Dr. Allen; (2) Mr. Throw's primary care physician, Dr. Kahn, diagnosed Mr. Throw with Generalized Anxiety Disorder, and later added the diagnoses of Bipolar Disorder, Nightmares, Visual Hallucinations, Schizophrenia, and Auditory Hallucinations; and (3) Mr. Throw's psychiatrist, Dr. Popli, diagnosed Mr. Throw with Unspecified Bipolar and Related Disorder and Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, and additionally found that, "[d]iagnostically, it appears that PTSD may be a factor."

The ALJ's step 2 finding of a severe mental impairment did not refer to any of these diagnoses by name. Instead, the ALJ identified Mr. Throw's severe mental impairment as an "affective/anxiety/traumatic disorder complicated by an ethanol (ETOH) abuse disorder." In making this finding, the ALJ acknowledged that "the various clinicians of record attached a number of diagnostic names to the claimant's mental impairment(s)." But she said that, "***regardless of the diagnostic labels,***" she would consider Mr. Throw's "psychological symptoms of record and their impact on his functionality together, instead of separately"

because of her belief that mental diagnoses were "inherently subjective" and involved "substantial overlap in symptomology." [AR 17 (emphasis and bold in original)].

The Court has found other social security cases where ALJs used similar language about "overlap in symptomology" and the "inherently subjective nature of mental diagnoses" as a reason for considering those diagnoses together in assessing the claimant's functional limitations from those impairments. But in all of those cases, it appears that the ALJs identified the claimants' severe mental impairments at step two with the medical diagnoses found in the record.[24] As Plaintiff argues, the ALJ's decision to replace the diagnoses of Mr. Throw's treating mental health professionals with a combined diagnostic label of her own making, on the theory that mental diagnoses "are inherently subjective" and involve overlapping symptomology, smacks of "playing doctor." *See, e.g., O'Connor-Spinner*, 832 F.3d at 697 ("Rather than relying on the guidance of professionals and evidence from [the plaintiff's] treating sources, the ALJ 'played doctor' by substituting his opinion for their medical judgment.").

---

[24] *See, e.g., John P. v. Kijakazi*, No. 2:20-CV-8455, 2022 WL 2314966, at *6 (D.N.J. June 28, 2022) (finding at step 2 that the claimant suffered from severe impairments of depressive disorder; bipolar disorder; panic disorder); *Whitt v. Kijakazi,* No. 1:21-cv-86-LLK, 2022 WL 885041, at *1 (W.D. Ky. Mar. 24, 2022) (finding at step 2 that the claimant suffered from severe impairments of bipolar disorder, mood disorder, anxiety, depression, and PTSD); *Davis v. Comm'r of Soc. Sec*., No. 1:18-CV-1309, 2019 WL 6718741, at *2, 5 (W.D. Mich. Nov. 25, 2019) (finding at step 2 that the claimant suffered from severe impairments of "affective disorder, and anxiety disorder"); *Marilyn R. v. Comm'r of Soc. Sec*., No. 4:18-cv-4098-SLD-JEH, 2019 WL 4891703, at *2 (C.D. Ill. July 18, 2019) (finding at step 2 that the claimant suffered from severe impairments of "major depressive disorder (MDD)"), *report and recommendation adopted sub nom*. *Marilyn R. v. Saul*, No. 4:18-cv-4098-SLD-JEH, 2019 WL 4389052 (C.D. Ill. Sept. 13, 2019).

The Commissioner argues that "the ALJ's finding at step two specifically included some of" Mr. Throw's diagnosed mental impairments, and "the analysis of listed impairments[25] at step three also captured some of these alleged disorders." [DE 18 at 4]. The Commissioner then asserts that, "[a]t step two, 'a physical or mental impairment must be established by objective medical evidence from an acceptable medical source,' and a diagnosis will not suffice." [*Id.* at 4]. Following this, the Commissioner asserts that "the ALJ found that Plaintiff had … a severe affective/anxiety/traumatic disorder" and "[i]t is therefore unclear how Plaintiff can assert that 'the decision does not identify any of [his] mental diagnoses as stated in the medical record.'" [*Id.* at 5]. The Commissioner then cites case law for the proposition that any error at step 2 is harmless so long as the ALJ finds at least one severe impairment and therefore moves on to step 3 to address the listings, and then, if necessary, steps 4 and 5 where the ALJ determines and applies the claimant's RFC. [*Id.* (citing *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019), and *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012))]. Finally, the Commissioner asserts that the listings for mental disorders are divided in such a way as "to address a collection of disorders," so the "ALJ's 'consolidated' labeling of [Mr. Throw's] mental impairments was [not] contrary to Agency regulations." [*Id.* at 8].

From these somewhat disjointed assertions, the Court perceives the Commissioner's position essentially to be that, regardless of whether the ALJ "played doctor" by using her own diagnostic label, that error was of no moment. The Court agrees that the ALJ's step two mental

---

[25] The listed impairments are those impairments that the Commissioner has determined are presumptively disabling, which are set out in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1. The mental impairment Listings are found at 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00 *et seq.*

impairment finding captured "some of" Mr. Throw's severe mental impairments and insofar as those impairments are concerned the finding was not reversible error simply because the ALJ used a different name for those impairments.[26] But in several other respects, the ALJ's step two finding involves substantive errors beyond the renaming of Mr. Throw's mental impairments, and those errors were not harmless.

### *Error #1*

Most significantly, the ALJ's combined mental impairment finding omits Dr. Popli's diagnosis of an Unspecified Schizophrenia Spectrum or Other Psychotic Disorder. This omission is apparent from the ALJ's selection of the labels used in the name of her combined mental impairment, "affective[]/anxiety/traumatic," as well as from her discussion at step 3, where she addressed Listing 12.04, Depressive, bipolar and related disorders, Listing 12.06, Anxiety and obsessive-compulsive disorders, and Listing 12.15, Trauma- and stressor-related disorders, but *not* Listing 12.03, Schizophrenia spectrum and other psychotic disorders. The ALJ does not explain why she excluded a schizophrenic/psychotic disorder from her severe mental impairment finding. Indeed, the words schizophrenia and psychosis/psychotic are not mentioned anywhere in the ALJ's decision. As set forth in the background section of this opinion, there is substantial evidence in the record that Mr. Throw suffered from a severe[27]

---

[26] The Court notes, however, that the ALJ's finding of an "affective disorder" uses the terminology of the old version of the mental impairment listings. In the current version of the listings, the SSA has replaced "affective disorders" with a new category named "bipolar and related disorders."

[27] Mr. Throw's mental impairment from a schizophrenic/psychotic disorder plainly meets the severity requirement. *See, e.g., O'Connor-Spinner*, 832 F.3d at 697 (describing the ALJ's finding that "major depressive disorder" was not a severe impairment as "nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from

unspecified schizophrenic or other psychotic disorder. The ALJ's omission from her step 2 findings of Mr. Throw's severe mental impairment of an unspecified schizophrenia spectrum or other psychotic disorder was "unquestionably an error." *Vanessa C. v. Kijakazi*, No. CV 20-363MSM, 2021 WL 3930347, at *5 (D.R.I. Sept. 2, 2021); *see Meuser v. Colvin,* 838 F.3d 905, 910 (7th Cir. 2016) ("We have difficulty imagining how an uncontested diagnosis of schizophrenia (which describes [the plaintiff's] situation here) could *not* survive Step 2." (emphasis in original)); *Salazar v. Barnhart,* 468 F.3d 615, 621-22 (10th Cir. 2006) (holding that the ALJ erred in failing to find that the plaintiff suffered from borderline personality disorder where a treating psychiatrist and a treating psychologist diagnosed the plaintiff with the disorder after conducting "the most thorough examinations in the record," and where "the references to this disorder … appear[ed] repeatedly and consistently throughout the record, and include[d] the reports from several emergency room physicians and counselors").

Based on the ALJ's decision, the Court cannot tell what the ALJ thought about the evidence regarding Mr. Throw's diagnosed schizophrenic/psychotic disorder because the decision says nothing about it. *See, e.g., Edgell v. Kijakazi*, No. CV 21-269 KK, 2022 WL 1987846, at *4 (D.N.M. June 6, 2022) ("Notwithstanding the ALJ's generic assertion that she considered all of [the plaintiff's] psychological symptoms 'regardless of the diagnostic label attached,' the Court is troubled by her failure to even discuss whether [the plaintiff's] PTSD is a severe medically determinable impairment, much less acknowledge record evidence that [the plaintiff] suffers from symptoms specific to this disorder, including nightmares, avoidance of

---

'clinically significant distress or impairment in social, occupational, or other important areas of functioning'").

triggers, and hypervigilance."). The Commissioner's explanation for the ALJ's omission of Mr. Throw's schizophrenia/psychotic disorder diagnosis regarding the need for objective medical evidence from an acceptable medical source doubly violates the *Chenery* principle because, not only did the ALJ never make a finding of any kind regarding Mr. Throw's schizophrenia diagnosis, but the reason the ALJ gave for not referring to Mr. Throw's medical diagnoses at step 2 was that those diagnoses were "inherently subjective" and had "overlapping symptomology," not that any of those diagnoses lacked support in the objective medical evidence or that Plaintiff was diagnosed by an unacceptable medical source. *See Meuser*, 838 F.3d at 911 ("the ALJ did not rely on this rationale in his opinion, so the Commissioner cannot now rely on it" (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88 (1943), and *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012)).[28]

---

[28] "The ALJ's opinion is important not in its own right but because it tells [the court] whether the ALJ has considered all the evidence, as the statute requires h[er] to do." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Here, the Court is unable to conduct judicial review of the ALJ's true reason for her omission because she did not include it in her decision. However, the Court notes that a different reason from the one the Commissioner now suggests appears elsewhere in the record. The ALJ questioned Mr. Throw's counsel at the hearing about his claim that schizophrenia was one of Mr. Throw's severe impairments, stating that a January 2020 treatment note indicated that Dr. Popli "did not consider your client to meet the diagnostic criteria for that." [AR 40]. The clinic note in question was from Dr. Popli's first session with Mr. Throw, where Dr. Popli wrote that he was "not convinced" that Mr. Throw's symptoms were consistent with schizophrenia. [AR 1051]. The same treatment note, however, shows that Dr. Popli's comment about schizophrenia did not *exclude* a psychotic disorder diagnosis; in fact Dr. Popli wrote that his "working [diagnosis]" was "Unspecified Bipolar dx *and Other Specified Psychosis*." [*Id.* (emphasis added)]. In later clinical notes, Dr. Popli gave his diagnoses as "Unspecified Schizophrenia Spectrum & Other Psychotic Disorder" and "Unspecified Bipolar." [AR 1040, 1044]. In other words, the record shows that Dr. Popli consistently diagnosed Mr. Throw with some kind of psychotic disorder. It is worth noting, however, that even if Dr. Popli had omitted a psychotic disorder from his original diagnosis, that would not be a sufficient basis for the ALJ to reject his diagnosis of a psychotic disorder in later treatment notes. *See Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018) (stating

That having been said, in understanding the ALJ's error at step two and how that error infected the remaining steps of the ALJ's analysis, it is important to explain why an argument about the absence of objective medical evidence from an acceptable medical source is legally erroneous. Mr. Throw was diagnosed with an unspecified schizophrenic or other psychotic disorder by Dr. Popli, and Dr. Popli is a licensed psychiatrist, which is an "acceptable medical source."[29] In addition, Dr. Popli's diagnosis was based on "objective medical evidence,"[30] including signs[31] and laboratory findings[32] demonstrating the existence of the impairment. *See, e.g., Kimberly R. v. Saul,* No. 2:20-CV-03489-MAA, 2021 WL 1338440, at *4 (C.D. Cal. Apr. 9, 2021) (objective medical evidence consisted of psychiatrist's diagnosis).

---

that "[p]hysicians may update their views without being inconsistent if their later opinions are based on a patient's changed condition").

[29] *See* 20 C.F.R. § 404.1502(a) (An "acceptable medical source means a medical source who is [among others] a … Licensed physician (medical or osteophathic doctor); [or] Licensed psychologist ….").

[30] Objective medical evidence" means "signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f).

[31] "Signs means one or more anatomical, physiological, or *psychological abnormalities* that can be observed, apart from [the claimant's] statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. *Psychiatric signs* are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception and must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1502(g) (emphasis added).

[32] "Laboratory findings means one or more anatomical, physiological, or *psychological* phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and *psychological tests*." 20 C.F.R. § 404.1502(c) (emphasis added).

38

"A psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment … consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (internal quotation marks and citations omitted). "[W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques." *Id.*

Here, Dr. Popli's diagnosis is supported by the signs of visual and auditory hallucinations, paranoia, severe depression and anxiety, and extreme nightmares. *See Kimberly R.,* 2021 WL 1338440, at *4 (diagnosis of psychotic disorder "was evidenced by signs and symptoms that included tactile hallucinations, auditory hallucinations, visual hallucinations, depression, anxiety, and insomnia"); *Hines v. Colvin,* No. C15-2004-LTS, 2016 WL 538469, at *6 (N.D. Iowa Feb. 9, 2016) (the observations made by the plaintiff's treating psychiatrist and therapist "are 'signs' that constitute objective medical evidence in the context of mental impairments"). And these signs, including Mr. Throw's hallucinations, were found to exist by Mr. Throw's treating psychiatrist using medically acceptable clinical diagnostic techniques. *See Crim v. Astrue*, No. 1:11-cv-137, 2012 WL 2711456, at * (S.D. Ohio July 9, 2012) ("interviews are clearly an acceptable diagnostic technique in the area of mental impairments and Dr. Hickert could rely upon the subjective complaints elicited during her treatment sessions with Plaintiff in formulating Plaintiff's functional restrictions"), *report and recommendation adopted*, 2012 WL 3156130, at *1 (S.D. Ohio Aug. 3, 2012); *Irwin v. Astrue*, No. 1:07-CV-187, 2008 WL

2151417, at *10 (N.D. Ind. May 21, 2008) ("'[a] patient's report of complaints, or history, is

an essential diagnostic tool[,]' and [the plaintiff's] problems are psychiatric in nature'" (internal

citations omitted)); *see also Salina S. v. Kijakazi*, No. 1:20-CV-00515-REP, 2022 WL 3700880,

at *8 (D. Idaho Aug. 25, 2022) ("[C]linical interviews and mental status evaluations, while

always based on self-reports, are nevertheless 'objective measures' that ALJs may not routinely

disregard."); *Marshall v. Berryhill*, Civ. No. WHO-19-00306, 2020 WL 1531358, at *11 (N.D.

Cal. Mar. 31, 2020) (ALJ erred in requiring objective evidence of hallucinations because

psychiatric conditions necessarily depend on a claimant's self-reporting).

Nothing in the record suggests that Dr. Popli, who reported the hallucinations and other

signs in his clinical notes (among others, including also Dr. Kahn and Ms. Chase), felt they

were not genuine. *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1200 (9th Cir. 2008) ("There

is nothing in the record to suggest that [the physician] disbelieved [claimant's] description of

her symptoms, or that [the physician] relied on those descriptions more heavily than his own

clinical observations[.]"); *Kimberly R.*, 2021 WL 1338440, at *4 (same). Indeed, Dr. Popli and

Dr. Khan both prescribed Mr. Throw anti-psychotic medications to address the hallucinations.

*See, e.g., Brenda L. v. Kijakazi*, No. 3:21-cv-859-WCL, 2022 WL 2763561, at * 6 (N.D. Ind.

July 15, 2022) (finding that the record contained evidence of a medically determinable

depressive disorder where, among other things, the plaintiff's physicians had prescribed anti-

depressant and anti-anxiety medications).

Although an ALJ is under no obligation to articulate her reasons for rejecting every

piece of evidence before her, she cannot ignore an entire line of evidence, as the ALJ did here.

*See Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995); *Herron v. Shalala*, 19 F.3d 329, 333 (7th

Cir. 1994). Plaintiff argues, and the Court agrees, that the ALJ's error of omitting Mr. Throw's

diagnosis of schizophrenia or other psychotic disorder is a direct result of her failure to apply the "special technique" used by the SSA to "evaluate the severity of mental impairments … at each level of the administrative process." 20 C.F.R. § 404.1520a(a). At the step two stage, that technique requires the ALJ to "first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [he] ha[s] a medically determinable mental impairment(s)." *Id.* § 404.1520a(b)(1). If a mental impairment is found, the ALJ "*must specify* the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and *document [her] findings* in" her decision. *Id.* (emphasis added); *see also id.* § 404.1520a(e)(4) ("The [ALJ's] decision must show the significant history, including examination and laboratory findings[.]").

The ALJ did not document any analysis as required by the regulation so the Court is unable to tell if she properly considered Mr. Throw's symptoms, signs, and laboratory findings for purposes of identifying his medically determinable mental impairments. Instead, the ALJ simply stated that she found a severe mental impairment (identified as an affective/anxiety/traumatic disorder complicated by an ethanol abuse disorder), "for the reasons described more thoroughly below when addressing the claimant's residual functional capacity." [AR 17]. It may sometimes be proper to examine the ALJ's RFC discussion for the necessary detail to review the ALJ's findings at other steps of the evaluative process. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (applying that rule to the ALJ's step 3 analysis). But here that approach does not save the ALJ's step 2 findings. *See Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008) ("the RFC analysis is not a substitute for the special technique, even though some of the evidence considered may overlap"). The ALJ's RFC analysis does not identify the evidence of record the ALJ found credible for establishing the existence of a mental impairment

41

as required by the special technique, nor does it tie any evidence to any specific mental impairment or impairments that the ALJ found were severe. To be sure, the ALJ did address some of the relevant evidence in her RFC discussion. But she never explained her step 2 finding of an "affective/anxiety/traumatic disorder complicated by an ethanol (ETOH) abuse disorder" with citation to or discussion of evidence in the record that demonstrated those mental impairments. Nor did she ever explain her reasons for determining that Dr. Popli's schizophrenic/psychotic diagnosis did not warrant inclusion in her step 2 finding.

In addition to omitting Mr. Throw's severe mental impairment of schizophrenia or other psychotic disorder, the ALJ made at least two other substantive errors in her step 2 finding, which errors, again, could have been avoided had the ALJ applied the special technique properly.[33]

### *Error #2*

One of the ALJ's additional errors is her finding of an "ethanol (ETOH) abuse disorder" when the record contains no *medical* diagnosis of such a disorder. In fact, the only medical evaluation in the record of a possible ethanol, i.e., alcohol, abuse disorder is an assessment done by Dr. Popli, and that assessment came out negative. *See supra,* footnote 20. The ALJ seems to have inferred an ethanol abuse disorder based on a note in Dr. Popli's treatment records indicating that Mrs. Throw called the office to report that Mr. Throw was in the hospital and

---

[33] Although Plaintiff did not make any specific argument for reversal based on these two additional step 2 errors, the Court views them as encompassed in Plaintiff's more general argument that the ALJ failed to apply the special technique properly. In addition, even if Plaintiff did not sufficiently raise the issues in her brief, the Court finds that, in the interests of justice, the errors should be addressed. The Court does not find fault with either party for the issues that were or were not addressed in the briefing. Indeed, the attorneys for both sides are to be commended for their efforts on a very difficult record.

had been drinking heavily for the past six months. But that appears "to be the ALJ's own inference," not the inference of any medical professional. *Myles v. Astrue*, 582 F.3d 672, 677–78 (7th Cir. 2009). Records from Mr. Throw's emergency room visits in April 2019 and March 2020 indicate that Mr. Throw was intoxicated at those times, but there is no medical diagnosis of an alcohol abuse disorder in them.[34] Ethanol abuse disorder is a medical diagnosis "and functionally therefore a field of medicine." *Browning v. Colvin,* 766 F.3d 702, 705 (7th Cir. 2014). "[A]s th[e] [Seventh Circuit] has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). The ALJ made a medical finding about Mr. Throw's hospitalization, and worse, she made a finding that appears to conflict with that of the medical professionals who treated Mr. Throw at the time, as well as one that conflicts with the agency reviewers, who found that "[t]here is no evidence of any substance abuse disorder/DAA issue." [AR 87, 104].

In addition to her medical diagnosis of an ethanol abuse disorder, the ALJ also described the March 2020 emergency room visit as an "ethanol (ETOH) induced event." [AR 23]. But the hospital records assess Mr. Throw only with a "behavioral/psychiatric disorder." [AR 1088]. The ALJ's description of an "ethanol (ETOH) induced event" improperly assumes a conclusion about the cause of Mr. Throw's altered mental state that day. *See Kangail v. Barnhart*, 454 F.3d

---

[34] The ALJ also states that Mr. Throw "present[ed] to the exam [referring to an unidentified echocardiogram] smelling of ethanol (ETOH)." [AR 23]. But the ALJ does not identify where in the record this evidence is found (citing generally to three exhibits consisting of 380 pages), so the Court will disregard this factual statement rather than search the record for evidence confirming its accuracy. *Cf. DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) (court should not have "to play archaeologist with the record").

627, 629 (7th Cir. 2006) (finding error where the ALJ "went so far as to attribute bipolar disorder to substance abuse," when the only "clear" relationship between the two was that "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms"). The ALJ "improperly made [her] own psychological assessment of [Mr. Throw]." *Rohan*, 98 F.3d at 970.

The ALJ's treatment of the alcohol issue was not harmless. An ALJ can properly consider an ethanol abuse disorder in applying 20 C.F.R. § 404.1535(a), which states that, "[i]f we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." But the ALJ did not find that Mr. Throw was disabled and thus was not applying that regulation. Instead, the ALJ used her own medical finding of an ethanol abuse disorder to impeach Mr. Throw's credibility. First she stated that Mr. Throw "regularly denied ongoing substance use," with only the thinnest of evidentiary support for either the assumed fact that Mr. Throw was guilty of ongoing substance use or that he "regularly denied" it. Then she used that unsupported statement to suggest that the clinical notes of Mr. Throw's treating physicians might not be accurate because, she assumed, Mr. Throw had not been honest with those physicians about his drinking problem.[35]

The ALJ's speculation about Mr. Throw's treating physician's treatment notes was improper. *See Crim*, 2012 WL 2711456, at *8 (rejecting ALJ's speculation that the claimant's

---

[35] See [AR 23 (stating that "a second ethanol (ETOH) induced event … further detracted from the persuasiveness of the claimant's subjectively reported symptom persistence and intensity, as he regularly denied ongoing substance use, … suggesting that the claimant was at times, less than forthright with is treating clinicians, which could have affected the objective clinical records")].

treating psychiatrist "was unaware of [the claimant's] polysubstance abuse," and holding that the ALJ "impermissibly acted as his own medical expert" by rejecting the treating psychiatrist's assessment that the claimant's polysubstance abuse was in remission). This is not to say that an ALJ is prohibited from considering substance abuse for any purpose other than a finding under 20 C.F.R. § 404.1535(a). *See, e.g., Halik v. Astrue,* No. 209-CV-379-PRC, 2010 WL 3927494, at *11-14 (N.D. Ind. Sept. 30, 2010); *Denham v. Astrue*, No. 1:09-CV-04, 2010 WL 457116, at *6-8 (N.D. Ind. Feb. 4, 2010). But here, the ALJ made a medical finding of an alcohol abuse *disorder* without factual support in the record, and then relied on that finding rather than the evidentiary record to make assumptions about Mr. Throw's alcohol use, which she then applied in assessing Mr. Throw's RFC and evaluating the clinical findings of his treating doctors. "While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, [she] is not permitted to make [her] own evaluations of the medical findings." *Crim*, 2012 WL 2711456, at *8. The ALJ's alcohol-related findings are neither adequately explained in the decision nor supported by substantial evidence and constitute reversible error.

### *Error #3*

While the above errors are significant enough to require remand, another step 2 error "compels [the Court] to soldier on." *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011). The ALJ treated Mr. Throw's syncope episodes as two separate impairments, one supported by objective medical evidence and one not. The ALJ identified the first impairment as "the late effects of arrhythmia status post loop-recorder implantation (syncopal events)," and the second as an "allegation … [of] a history of seizures." The ALJ determined that only the first was a severe medical impairment. The second, alleged history of seizures, the ALJ found, was a "non-

medically determinable" impairment because it was not established by objective medical evidence from an acceptable medical source. The ALJ did not explain what any of these findings meant or how she arrived at them. But the findings clearly affected the ALJ's later evaluation at steps 4 and 5 in that the ALJ did not impose any significant functional limitations in Mr. Throw's RFC to account for the occurrences of losing consciousness that he continued to experience.

In making her step 2 findings regarding Mr. Throw's loss of consciousness episodes, the ALJ once again "played doctor." "Syncope" is the medical term for fainting or passing out caused by a temporary drop in the amount of blood flowing to the brain, which can happen from a sudden drop in blood pressure or in heart rate.[36] When Mr. Throw first began suffering episodes of a sudden loss of consciousness, his doctors treated those episodes as a symptom related to his cardiac issues, and thus used the term "syncope" to describe those events. Apparently based on these medical records, the ALJ stated, accurately, that Mr. Throw "was seen in the emergency room for syncopal and cardiac complaints workup, which prompted a loop-recorded [sic] implantation."[37] But the ALJ went further to state that "the follow up records confirm[ed] no recorded events." In fact, Mr. Throw did continue to report episodes following the loop-recorder implantation, the only difference being that he reported the events

---

[36] *See https://my.clevelandclinic.org/health/diseases/17536-syncope* (last visited September 22, 2022).

[37] It is unclear why the ALJ's finding of a severe impairment used the term "*post* loop–recorder implantation" when she acknowledged that at least one of those events occurred *prior to* the loop–recorder implantation and in fact prompted it. One possible explanation is that the ALJ was imposing her own medical judgment that there was a causal connection with the loop–recorder implantation, which then justified treating the syncope events that occurred after the loop-recorder was removed in August 2018 differently.

during office visits with his various doctors rather than presenting to the emergency room. Later in the decision, the ALJ referred to Mr. Throw's reports to his doctors of losing consciousness after his pacemaker had been implanted as "syncopal events" that were "unwitnessed by a clinician." [AR 23 (emphasis added)]. This comment and the ALJ's previous reference to there being no "recorded events" of syncope following the loop-recorder implantation are telling. They suggest that the ALJ might be drawing an illogical distinction between an ER visit, which she apparently credited as a "recorded" syncope event (even though no doctor at the ER witnessed the occurrence that caused Mr. Throw to go to the ER), and Mr. Throw's later reports to his doctors, which the ALJ apparently did not credit because they were "unwitnessed by a clinician" (even though they, like the ER events, were 'recorded' in the treatment notes). If the syncope events Mr. Throw reported to ER personnel were a medically determinable impairment, then logically the syncope events that Mr. Throw reported to his doctors should have been treated similarly.

In any event, the fact that the so-called "post loop-recorder" episodes were not "witnessed" is not a sufficient basis to reject Mr. Throw's testimony about their occurrences. *See, e.g., Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015) (holding that the fact that "a psychologist and a therapist who testified that the applicant suffers from panic attacks had not 'witnessed [his] panic attacks' … was no basis for disbelieving that he experiences panic attacks). Moreover, Mr. Throw's continued episodes *were* witnessed—by his wife. From Mrs. Throw's reports of the episodes that appear in some of Mr. Throw's treatment notes, it is obvious that Mrs. Throw was seriously concerned about what she witnessed. There simply is no credible reason to think that Mrs. Throw was making it all up. (If the ALJ felt that Mrs. Throw was biased, that needed to be explored, and weighed against the other evidence in

the record.) In fact, Mr. Throw's doctors obviously believed the reports. While Mr. Throw's cardiologist was unable to make any connection between the continuing black-out events and any cardiology issue, he speculated that, "[b]ased on [Mr. Throw's] history, the "syncope could [actually] be … pseudo-seizures." [AR 600]. He therefore referred Mr. Throw to a neurologist. The ALJ found, however, that Mr. Throw's continued reports of episodes of losing consciousness were not credible because "neurologic testing failed to confirm an etiology." [AR 23]. But the neurologist did not disbelieve Mr. Throw because of that inability to confirm a neurological etiology. Instead, the neurologist assessed the situation as presenting a possible "[p]sychogenic syncope" event, and he suggested a sleep study for further diagnostic purposes. [AR 996].

In other words, it appears from the record that both Mr. Throw's treating neurologist and his treating cardiologist considered Mr. Throw's "syncope" and his "pseudo-seizures" to be the same impairment, and both suggested that a possible cause for the impairment could be psychological rather than cardiac-related or neurological. The ALJ imposed her own medical judgment by discounting all of this evidence in finding that Mr. Throw's "post loop–recorder seizures" were not a medically determinable impairment. No doctor to whom Mr. Throw reported his recurring syncope/pseudo-seizure episodes (including Mr. Throw's cardiologist, neurologist, pulmonologist, primary care physician, or psychiatrist) ever indicated that he doubted Mr. Throw's and/or his wife's reports of what had occurred. That Mr. Throw's doctors were not certain of the cause of Mr. Throw's syncope/pseudo-seizure impairment was not a proper basis for rejecting the evidence in the record indicating that the impairment persisted past the date on which the loop recorder was removed and Mr. Throw received a pacemaker. *See Lambert*, 896 F.3d at 775 ("Given [the plaintiff's] chronic back condition, it was improper

to reject Dr. Paul's mid-2014 assessment merely because he could not isolate the source of the pain.").

The ALJ also found Mr. Throw's reports of continued syncope/pseudo-seizure episodes were not credible because his pulmonologist "did not place permanent work restrictions" on him and because of a supposed "report that [Mr. Throw] continued to work, post-alleged onset date." [AR 23].[38] The connection between either of the cited facts to the credibility of Mr. Throw's reports of continued syncope/pseudo-seizure episodes is unclear. Without further explanation, the ALJ suddenly appears to attribute the cause of Mr. Throw's syncope/pseudo-seizures to a pulmonary issue, but she does not point to any evidence that Mr. Throw's doctors thought that might be the cause. Mr. Throw's treating pulmonologist indicated that the cause was being investigated by Mr. Throw's cardiologist and neurologist, so it is not clear why that doctor would have been focused on treating the issue or imposing work restrictions based on it. And the ALJ did not develop the record regarding the report that Mr. Throw was working post–disability filing. For example, the ALJ never asked Mr. Throw about it at the hearing. As the Seventh Circuit has said, "[a] person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).

Finally, the ALJ thought Mr. Throw's reports of continued syncope/pseudo-seizure episodes were not credible due to what she said was an "absence of … ongoing treatment for the [alleged seizure disorder]." [AR 23]. That finding appears to be lifted from the state agency

---

[38] Once again, the Court is unable to review the second asserted fact for evidentiary support because the ALJ did not give a specific citation to where in the pages of the multiple exhibits she cites the supposed report that Mr. Throw continued to work can be found.

psychological reviewer's assessment, which states that the medical evidence of "syncope" in the record consisted of "atypical reports of symptoms with (lack of) seeking treatment." [AR 98]. The reviewer's assessment is confusing because of the parentheses in the sentence, and also lacks any explanation, not to mention that the reconsideration review occurred on September 19, 2019, and thus did not consider medical records from after that date. Overall, the medical records document regular visits with treating doctors in multiple areas (cardiology, neurology, pulmonology, family practice, psychiatry) where the episodes were reported and discussed, with Mr. Throw's doctors recommending medication adjustments that were not successful in solving the problem. The ALJ improperly found lack of treatment without considering "possible reasons [Mr. Throw] may not [have] … s[ought] treatment," SSR 16-3p, 2017 WL 5180304, at 9, and without citing to evidence that any doctor gave Mr. Throw treatment options that he failed to follow-up on, other than the suggested sleep study for which there appears to have been an insurance obstacle. *See supra* footnote 9.

### *Summary of Step 2 Errors*

In sum, although the Court acknowledges the case law cited by the Commissioner to the effect that any error at the step 2 stage is harmless insofar as step 2 is a "threshold issue," the ALJ's step 2 errors here clearly were not harmless. The ALJ's step 3 analysis does not encompass Mr. Throw's schizophrenic or psychotic disorder, and Mr. Throw's symptoms from that disorder such as his auditory and visual hallucinations are given short shrift in the ALJ's RFC analysis. *See Craft,* 539 F.3d at 675 (ALJ's error at step two of failing to apply the special technique in assessing the claimant's severe mental impairments was not harmless because it led the ALJ to "g[i]ve short shrift to potential limitations caused by [the plaintiff's] mental impairments" later in the RCF analysis); *O'Connor-Spinner*, 832 F.3d at 697 (holding that the

50

ALJ's step 2 finding that major depression was not a severe impairment was not harmless; "[b]ecause the [ ] ALJ eliminated depression at Step 2, he did not take into account *any* effects which the disorder might have on [the plaintiff's] ability to maintain employment" (emphasis in original)). And the ALJ's improper diagnosis of an "ethanol abuse disorder" also affected the ALJ's view of the evidence and evaluation of Mr. Throw's symptoms in both the decision's step 3 Listing analysis and step 4 RFC findings. *See Sexton v. Astrue*, No. 2:11-cv-494-CAN 2013 WL 1703579, at *5, 7 (N.D. Ind. Apr. 18, 2013) (holding that the ALJ's failure to properly apply the special technique at step 2 was not harmless error because "an ALJ's improper consideration of a claimant's impairments can detrimentally affect the credibility determination"). Finally, the ALJ's failure to properly evaluate Mr. Throw's episodes of syncope/pseudo-seizures at step 2 led "the ALJ [to] also fail[ ] to evaluate th[at] evidence at the other stages of the sequential evaluation." *Brenda L.,* 2022 WL 2763561, at *7.

### C.   LISTING ANALYSIS

The ALJ's failure to properly apply the special technique also led to reversible error at step 3 of the evaluative process, when the ALJ considered Listings 12.04, 12.06, and 12.15. For the reasons already discussed, the ALJ erred in failing to include Listing 12.03 among the mental impairments listings she considered. This listing, as well as the ones the ALJ discussed, share the same structure. First, the claimant must show that he satisfies the paragraph A diagnostic criteria for each listing. If the claimant meets the paragraph A criteria, then the ALJ considers the additional criteria in paragraph B and C, and those criteria are the same for each of the listings at issue.

The ALJ found that Mr. Throw did not meet the requirements of paragraph B based on the ALJ's findings of only moderate limitations in each of the four areas of mental functioning.

The ALJ's findings regarding the four areas of mental functioning would not withstand a substantial evidence scrutiny.[39] But because the parties focus their arguments on paragraph C, the Court will do the same.

_____

[39] The ALJ's moderate findings were based almost exclusively on Mr. Throw's daily activities as reported in his Function Reports. That focus was off-base here because Mr. Throw completed the Function Reports before he was first diagnosed with a mental impairment. In any event, the ALJ's description of Mr. Throw's reports about his daily activities was sprinkled with inaccuracies. Moreover, the ALJ failed to build a logical bridge between the daily activities she cited and her conclusions about Mr. Throw's mental functioning. Beyond these issues, the ALJ ignored many relevant categories of evidence for assessing Mr. Throw's mental functioning, including the treatment notes and opinions of Mr. Throw's mental health professionals, which indicate among other things that Mr. Throw was suffering from visual and auditory hallucinations and severe nightmares that caused him to thrash about and yell in his sleep and sometimes sleepwalk. *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) ("The ALJ's reasoning fails to account for the reality that hearing voices at night could interfere with [the plaintiff's] ability to sleep and thus her ability to function during the day."). The ALJ also did not discuss Mr. Throw's episodes of loss of consciousness and then confusion and loss of memory upon waking. These omissions are not corrected in the other parts of the ALJ's decision, leaving the Court "with grave reservations" as to whether the ALJ's assessment of Mr. Throw's mental functioning adequately addressed his functional limitations. *Scott*, 297 F.3d at 595; *see Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) ("[T]he ALJ skipped over the substantial findings of [the plaintiff's] treating physicians and physical therapist that showed that her impairments indeed would limit her ability to perform work tasks."). Additionally, the ALJ did not consider Dr. Popli's medical opinion, which she improperly rejected as discussed later in this opinion. Dr. Popli opined, among other things, that Mr. Throw had no ability to understand, remember, and carry out job instructions; difficulty in concentrating and three digit recall; limitations in ability to maintain personal appearance; no ability to deal with the public, use judgment, interact with supervisors, deal with work-related stress, function independently, or maintain attention/concentration; limited abilities to behave in an emotionally stable manner or relate predictably in a social manner; no ability to establish job reliability or to make simple work-related decisions; limited ability to respond appropriately to usual work situations or to deal with changes in routine work setting; and poor ability to respond appropriately to supervisors. [AR 1106-1107]; *see Benton v. Colvin*, No. 1:12-cv-945-DKL-WTL, 2013 WL 4519649, at *4 (S.D. Ind. Aug. 26, 2013) (finding the ALJ's assessment of mild limitations in mental functioning was not supported by the record where the plaintiff was consistently under the care of a psychiatrist for schizophrenia, and the treating psychiatrist assessed marked limitations).

52

Among other criteria not in dispute,[40] Mr. Throw needed to show the following

paragraph C2 criterion:

> Marginal adjustment, that is, [the claimant] ha[s] minimal
> capacity to adapt to changes in [his] environment or to demands
> that are not already part of [his] daily life (see 12.00G2c).

20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.03(C)(2), 12.04(C)(2), 12.06(C)(2), 12.15(C)(2).

The ALJ made the following finding on this issue: "[T]he evidence does not suggest that the

claimant possesses a minimal capacity to adapt to changes in his environment as no clinician

noted decompensatory events or exacerbatory [sic] psychological symptomatology, even after

factoring in the claimant's significant ethanol (ETOH) use issues." [AR 20]. Although the ALJ

did not explain her comment about "factoring in" the ethanol abuse disorder, she likely was

referring to the March 2020 hospitalization. That hospitalization was a decompensatory or

deteriorating event, yet the ALJ did not appear to credit it as such, describing it as being "ethanol

induced." Because the ALJ gave no further explanation, the Court cannot determine what the

ALJ's rationale was for finding that the C2 criteria was not met. The most that can be said is

that the ALJ concluded that Mr. Throw did not experience any deterioration in his mental health

---

[40] A preliminary finding required for paragraph C is that the mental disorder must be "serious and persistent," defined as a "medically documented history of the existence of the disorder over a period of at least 2 years." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(G)(2)(a); *see id.,* §§ 12.03(C), 12.04(C), 12.06(C), 12.15(C). In addition, paragraph C1 requires evidence of "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder." *Id.* .§§ 12.03(C)(1), 12.04(C)(1), 12.06(C)(1), 12.15(C)(1); *see also id.* § 12.00(G)(2)(b) ("We consider that you received ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition."). The Commissioner does not dispute that these paragraph C criteria are shown by the evidence in the record.

from his reported symptoms notwithstanding the March 2020 occurrence. But it is unclear what her logic was in reaching that conclusion. "While the ALJ is not held to a high bar of articulation at Step Three, some level of analysis is required." *Robert S. v. Kijakazi*, No. 1:20-CV-02235-MG-RLY, 2021 WL 5979361, at *6 (S.D. Ind. Dec. 16, 2021) (citing *Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015)); *see, e.g., Brindisi ex rel. Brindisi*, 315 F.3d at 786 (reversing because the ALJ's listing analysis was "devoid of any analysis that would enable meaningful judicial review"); *Kastner,* 697 F.3d at 647-48 (remanding where the ALJ's cursory listing analysis failed to articulate a rationale for denying benefits). That minimal level of analysis is lacking here.

In addition, the ALJ's reference to no clinician having noted any "*decompensatory events*" indicates a possible legal error in the ALJ's finding. The prior version of the mental impairment listings required "repeated episodes of decompensation" to satisfy the paragraph C criteria. But the SSA rejected the term decompensation in the current version of the mental impairment listings, in favor of the less extreme requirement of deterioration in symptoms:

> [D]ecompensation . . . refers to a state of extreme deterioration, often leading to hospitalization. It also suggests that the person is a danger to him- or herself or others. That degree of impairment exceeds what we generally intend in the paragraph C criteria when we refer to the "marginal adjustment" that makes a person vulnerable to deterioration in functioning. Furthermore, we also believe that continuing to use "decompensation" may result in confusion between the prior rules and these final rules. In these final rules, we no longer require "repeated episodes of decompensation, each of extended duration."

*Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66137, 66147 (Sept. 16, 2016). As shown by the above explanation for the agency's revision, the SSA specifically advised against using the term decompensation to avoid confusion between the prior rule and

54

the current rule. The Court cannot say that the ALJ applied the correct legal standard when she used the term decompensation, combined with her previously discussed perfunctory analysis of the C2 criterion.

The Commissioner does not attempt to defend the ALJ's possibly incorrect legal standard or perfunctory analysis of the C2 criterion. Instead, the Commissioner shifts the burden to Plaintiff to point to evidence "showing that [Mr. Throw's] impairment meets *all* of the specified medical criteria" for paragraph C2. [DE 18 at 9 (internal quotation marks and citation omitted, emphasis in original)]. The Commissioner is correct that, to "demonstrate that the ALJ's listing conclusion was not supported by substantial evidence, the claimant must identify record evidence that was misstated or ignored, and that could support a finding that claimant met or equaled the criteria." *Robert S.,* 2021 WL 5979361, at *6 (citing *Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002)). But Plaintiff has done that here.

The SSA explains that the "criterion in C2 is satisfied when the evidence shows that, despite [ ] diminished symptoms and signs, [the claimant] ha[s] achieved only marginal adjustment," and that "'[m]arginal adjustment' means that [the claimant's] adaptation to the requirements of daily life is fragile; that is, [he] ha[s] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(G)(2)(c). The SAA "will consider that [the claimant] ha[s] achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of [his] symptoms and signs and to deterioration in [his] functioning." *Id.* The SSA then gives several examples of how a claimant can show that changes or increased demands have led to an exacerbation of symptoms and signs and to deterioration in functioning. One is the inability to function outside of the home or a more restrictive setting "without

substantial psychosocial supports." *Id.* Psychosocial supports "includ[e] assistance from [the claimant's] family" that "may help [the claimant] by reducing the demands made on [him]," such as "family members … who monitor [the claimant's] daily activities and help [him] to function. For example, family members administer [his] medications, remind [him] to eat, shop for [him] and pay [his] bills, or change their work hours so [he] [is] never home alone." *Id.* § 12.00D(1), (1)(a). Another example is the need for "a significant change in medication or other treatment." *Id.* § 12.00D(1). And a third example is "episodes of deterioration that have required hospitalization or being absent from work." *Id.*

The record contains evidence from all three of the examples given in the regulations. The only example the ALJ mentioned was the third one, "episodes of deterioration," and, as discussed, it is impossible to say how the ALJ reached her conclusion that the March 2020 hospitalization did not amount to an episode of deterioration other than that her conclusion related in some way to her improper step 2 finding of an ethanol abuse disorder. Beyond that, the ALJ does not address the progressive increases in medications and treatment that the record shows, beginning when Dr. Khan first saw Mr. Throw for his anxiety and then increased Mr. Throw's dosage of Zoloft at the next appointment, followed by additional appointments where Dr. Khan added more medications to treat new symptoms that were starting to appear, such as nightmares and hallucinations. While Dr. Khan initially attempted to manage Mr. Throw's anxiety symptoms, he ultimately had to refer him for "other" more specialized treatment by a psychiatrist, due to Mr. Throw's worsening signs and symptoms. And Dr. Popli, like Dr. Khan, also had to make constant medication adjustments to treat worsening symptoms.

Mr. Throw's worsening symptoms were often tied to increased stress (e.g., from Mr. Throw's divorce, his inability to work, and his repeated episodes of syncope/pseudo–

seizures, for which his doctors were unable to determine any physical cause), thus strongly suggesting that "changes or increased demands" were leading to "an exacerbation of [Mr. Throw's] symptoms and signs" and to a "deterioration in [his] functioning." Indeed, a prominent feature of Mr. Throw's self-reports is his intolerance for stress. This is reflected in Dr. Popli's treatment notes, as well as in Ms. Chase's letter, which stated that Mr. Throw's concentration and decision-making were compromised by the Nightmare Disorder and PTSD, and that he would be a danger to himself and to others due to dissociating and forgetfulness. Ms. Chase also said that Mr. Throw was suicidal. Being suicidal, dissociating, and having compromised concentration and decision-making abilities as a result of extreme nightmares and PTSD, certainly suggest a person whose "adaptation to the requirements of daily life is fragile," particularly in terms of adjusting to the requirements of a 40-hour per week work schedule.

The Commissioner counters that the ALJ considered Ms. Chase's letter, and that Plaintiff is asking the Court to reweigh the evidence to come to a different conclusion about the significance of that evidence. [DE 18 at 9]. But the ALJ appeared to discount Ms. Chase's letter because the ALJ said she was "a non-approved source." [AR 22]. The ALJ's terminology seems somewhat off-base. Ms. Chase is not an "*acceptable* medical source" under the regulations,[41] which means she could not render a medical opinion or establish the existence of a mental

---

[41] However, Ms. Chase was working under the supervision of Dr. Allen, who is an acceptable medical source. The ALJ did not indicate whether Dr. Allen's approval of Ms. Chase's diagnoses might be sufficient under the applicable regulations to render Ms. Chase an acceptable medical source. *See, e.g., Lacroix v. Barnhart,* 465 F.3d 881, 886 (8th Cir. 2006) (discussing issue of whether a therapist may acquire acceptable medical source status by virtue of being associated with a physician or psychologist).

impairment.[42] But she is still an approved "medical source." *See* 20 C.F.R. § 404.1502(d)

("[m]edical source means an individual who is licensed as a healthcare worker by a State and

working within the scope of practice permitted under State or Federal law"). Thus, the ALJ was

required to consider her statements. *See id.* § 404.1545(3) ("We will consider any statements

about what you can still do that have been provided by medical sources"); *see also Thomas*,

826 F.3d at 961 ("Even though a physical therapist is not an acceptable medical source for

determining a claimant's impairments, this evidence may be used to show the severity of an

impairment and how it affects a claimant's ability to function."); *Sexton*, 2013 WL 1703579, at

*6 (same). Furthermore, the ALJ disregarded Ms. Chase's letter and treatment notes for the

same reasons and with citations to the same evidence that she used to discount Dr. Popli's

opinion, and, as shown in the next section, those reasons and evidence did not build a logical

bridge to a conclusion supported by substantial evidence.

Lastly, the record contains evidence of an inability to function outside of the home

without substantial psychosocial supports. It shows that, over time, Mr. Throw was becoming

more unable to function outside his home without his wife's constant involvement and

supervision, and that Mr. Throw could never be alone. This is seen in Dr. Popli's clinical notes

and in Mr. Throw's hearing testimony. There is evidence that, when he was alone, Mr. Throw

experienced significant deterioration, including drinking alcohol and at least one time when he

got into a physical fight at a gas station over someone parking in a handicap spot, returning

---

[42] *See* 20 C.F.R. § 404.1502(a) (definition of "acceptable medical sources"); 20 C.F.R.
§ 404.1520c (explaining how the SSA considers and articulate medical opinions); 20 C.F.R.
§ 404.1521("a physical or mental impairment must be established by objective medical
evidence from an acceptable medical source").

home with blood on his face and an altered state of mind. Even Mr. Throw's Function Reports––which were completed before the medical evidence suggests an escalation in the deterioration of Mr. Throw's functioning—show the need for these supports from Mrs. Throw. It is concerning that the ALJ did not elicit any testimony or evidence from Mrs. Throw, given how big a role she appears from the record to have played insofar as the C2 issues are concerned. To properly address the C2 criterion, the regulations state that the SSA will consider "the complete picture of [the claimant's] daily functioning, including the kinds, extent, and frequency of help and support [he] receive[s]," and they further indicate that "[t]he fact that [the claimant] ha[s] done, or currently do[es], some routine activities without help or support does not necessarily mean that [he] … [is] not disabled." *Id.* § 12.00D(3)(a). Thus, the claimant's "daily functioning may depend on the special contexts in which [he] function[s]. For example, [he] may spend [his] time among only familiar people or surroundings, in a simple and steady routine or an unchanging environment, or a highly structured setting. However, this does not necessarily show how [he] would function in a work setting on a sustained basis, throughout a normal workday and workweek." *Id.* § 12.00D(3)(b). There is sufficient evidence in the record for the Court to say that the ALJ's C2 finding without a discussion of any of these issues did not establish a logical bridge supported by substantial evidence for her conclusion that the C2 criterion was not met. *See, e.g., Herron v. Comm'r of Soc. Sec.*, 788 F. Supp. 2d 809, 817 (N.D. Ind. 2011) (remanding where the ALJ did not address "evidence that [claimant] was unable to function outside a highly supportive living arrangement, such as [claimant's] ex-wife's testimony that she had to treat [claimant] like a child, that she had to seek help for him because his capabilities became progressively more limited, and that 'he didn't ever seem to know what he was doing'").

Indeed, the central problem with the ALJ's discussion of the C2 criterion is one present throughout her decision: the ALJ incorrectly applies the regulatory requirement of a "longitudinal" assessment of the claimant's mental impairments. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(C)(5). The ALJ's conclusion that the "objective longitudinal record" showed "little to no symptomatology" is at odds with the medical evidence, which shows that Mr. Throw's mental health issues were only beginning to appear when he filed his disability application in September 2018, and that they progressively worsened with greater evidence of deterioration in mental functioning as time went on. From the record, the Court gleans two possible explanations for the ALJ's erroneous view of the longitudinal record: (1) an inaccurate and unsupported assessment of the significance of the absence of reported psychological symptomatology or treatment for mental impairments when Mr. Throw first stopped working and filed his disability application,[43] and (2) the timing of the hearing in the summer of 2020,

---

[43] The ALJ asserted that, "despite a history of pre-alleged on-set date treatment, the initial records documented no psychological abnormalities or limitations." [AR 21]. That statement is true but lacks context. Recall that Mr. Throw filed for disability and alleged an on-set date just prior to that filing based on *physical* impairments only. Mr. Throw had not yet received medical treatment for any mental impairments and did not allege those impairments as a reason for his disability until more than a year later, after he was diagnosed with severe mental health impairments by Ms. Chase. So of course none of Mr. Throw's pre-onset date medical records (cardiology records, pulmonology records, and hospital records from March and July 2018) reflect treatment for psychological symptoms or impairments. The ALJ's negative inference from the fact that Mr. Throw sought no treatment or reported symptomatology in a time period in which he was not aware that he suffered from a mental health issue was both legally improper because the ALJ did not first explore the reasons for lack of treatment, *see Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), and factually inapposite given the timeline of Mr. Throw's mental health problems. If anything, the earlier records cited by the ALJ are supportive of the existence of mental limitations or impairments because they show that, despite not yet being aware that he may be suffering from a mental disorder, Mr. Throw reported symptoms that, although not recognized as such at the time, appear in hindsight to be early signs of an emerging mental health problem. *See Scrogham v. Colvin*, 765 F.3d 685, 696–97 (7th Cir. 2014) (The ALJ "used faulty logic when she interpreted these pieces of record evidence as inconsistencies" in that "she failed to consider" that the plaintiff's condition was "progressive in nature" and

with Mr. Throw receiving minimal treatment in the immediately preceding months, quite likely

due in large part because of the stay-at-home orders related to the COVID-19 pandemic,[44]

which also might have contributed to something of a reprieve in Mr. Throw's symptoms as

outside demands and interactions would have been more limited in that time period.[45] *See*

*Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (having "symptoms that 'wax and wane'

[is] not inconsistent with a diagnosis of recurrent, major depression"); *Bauer v. Astrue*, 532

F.3d 606, 609 (7th Cir. 2008) (a claimant with a chronic disease like bipolar disorder "is likely

to have better days and worse days," and even if "half the time she is well enough that she could

work," she still "could not hold down a full-time job"). "Because of the episodic nature of

---

thus "changed over time."). The ALJ used the same faulty logic when she asserted that, "despite
a plethora of claims in the application/appeal, the State agency psychological consultants found
no support for a psychological medically determinable impairment." [AR 21]. Insofar as
Mr. Throw's *mental* impairments are concerned, the record does not support any "plethora of
claims" that were rejected by the state agency psychological reviewer, *see Craft* 539 F.3d at
679, because, again, Mr. Throw did not claim a mental impairment as one of the reasons for his
disability until *after* reconsideration review.

[44] The Court takes judicial notice of the fact that, on March 13, 2020, the President of the United
States declared a national emergency due to the COVID-19 virus, and, on March 24, 2020, the
Governor of Indiana issued a stay-at-home order for all individuals living in the state of Indiana
and requiring all non-essential businesses to cease operations. *See https://www.in.gov/gov/files
/Executive_Order_20-08_Stay_at_Home.pdf.* (last visited September 27, 2022). Although the
restrictions were gradually lifted, individuals were encouraged to remain at home through at
least June 13, 2020. *See https://www.in.gov/gov/files/Executive%20Order%2020-
28%20(Reopen% 20Stage3).pdf.* (last visited September 22, 2022), with many services and
business remaining closed or with limited operations past the date on which the ALJ hearing
was held, including this Court. *See In re: Court Operations Under The Exigent Circumstances
Created By Covid-19 and Related Coronavirus*, General Order Nos. 2020-06 (Mar. 18, 2020),
2020-10 (Apr. 9, 2020), 2020-14(B) (May 18, 2020), 2020-20 (June 25, 2020).

[45] For instance, the ALJ cites to Dr. Popli's May 6, 2020 treatment notes in saying that
Mr. Throw was well groomed and articulate with fluent speech, had good concentration and
attention span, with an euthymic mood. [AR 24]. That appointment took place by video due to
the COVID-19 pandemic.

bipolar disorder in particular, isolated evidence of higher functionality does not contradict longitudinal evidence of lower functionality." *Daniels v. Colvin*, No. 1:12–cv–00316–SEB–MJD, 2013 WL 3776515, at *6 (S.D. Ind. July 16, 2013).[46] Indeed, when properly assessed, Mr. Throw's perceived lack of symptomatology around the time of the ALJ hearing might actually *support*, not detract, from a finding that Mr. Throw's "adaptation to the requirements of daily life [was] fragile" since the demands on his daily life in that time period might have been significantly less than either prior to the COVID-19 closures or after societal restrictions eased up beginning in the fall of 2020.

In sum, the Court concludes that the ALJ's finding that Mr. Throw's mental impairments did not meet the criterion of paragraph C2 is not supported by substantial evidence. The Court further finds that Plaintiff has identified record evidence that was misstated or ignored, and that could support a finding that Mr. Throw's mental impairments satisfied the C2 criterion.

### D.   DR. POPLI'S OPINION

The ALJ found that Dr. Popli's opinion was "unpersuasive." In reviewing that conclusion, the Court applies 20 C.F.R. § 404.1520c. Pursuant to that regulation, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) … including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). The

---

[46] *See also Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) (When "a person who suffers from severe panic attacks, anxiety, and depression" improves, that "does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."); *Kimberly R.*, 2021 WL 1338440, at *4 (the fact that the plaintiff at certain times did not exhibit signs or symptoms of psychosis is not substantial evidence that the plaintiff never exhibits those signs).

most important factors in the ALJ's evaluation are the opinion's supportability and consistency. *Id.* "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) …, the more persuasive the medical opinion(s) …  will be." *Id.* § 404.1520c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical and nonmedical sources in the claim, the more persuasive the medical opinion(s) …  will be." *Id.* § 404.1520c(c)(2). In addition to supportability and consistency, the ALJ may also consider the relationship with the claimant (including the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); whether the medical source is a specialist in the area; and other factors that tend to support or contradict the medical opinion. *Id.* § 404.1520c(c)(3)-(5).

The ALJ found that Dr. Popli's opinion was "unpersuasive," citing two reasons for why it lacked support and two reasons for why it was inconsistent with the record.[47] On the issue of supportability, the ALJ first cited to the statement in Dr. Popli's opinion that Mr. Throw "claims he cannot walk to the mailbox without getting short of breath." The ALJ said "this limitation is not supported by the objective pulmonary function testing noted above." But the ALJ illogically construed the quoted sentence as an opinion concerning Mr. Throw's physical abilities. There is no reason to believe that Dr. Popli, a psychiatrist, intended to opine on Mr. Throw's physical condition. The more logical reading of the quoted sentence is that Dr. Popli was making a

---

[47] As an initial matter, the ALJ noted that the form completed by Dr. Popli was prepared by Mr. Throw's attorney. But the ALJ did not explain how that fact is disqualifying, and the Court does not see any reason for why it would negatively reflect on the core inquiries of supportability or consistency.

connection between Mr. Throw's report about not being able to walk to the mailbox and his state of mind. True, without further explanation the comment is not all that helpful in shedding light on Mr. Throw's mental functioning. But the ALJ distorts Dr. Popli's opinion by focusing only on the mailbox comment, without mentioning any of the more salient parts of his opinion, such his comments about Mr. Throw's hallucinations, sleep disturbance, and the possibility of Mr. Throw taking actions that he might not recall. [AR 1107 (stating that the reasons for his opinion were functional limitations caused by Mr. Throw's nightmares ("walking up at night"), blackouts ("doing actions which he does not recall"), and psychotic episodes ("unusual visual and auditory hallucinations")].

The second reason the ALJ gives for finding that Dr. Popli's opinion lacked support is that "the persuasiveness of the opinion is eroded by the express reliance on claimant's subjective reports of functioning rather than objective record." This criticism is off mark. It is true that "[a]n ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations." *Dixon*, 270 F.3d at 1178 (citing *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). But that is not the situation here. To begin with, there is no reason to believe that Mr. Throw's symptom reports were "exaggerated." Additionally, the ALJ "cherry-picked" the mailbox comment because it is obvious from the opinion that Dr. Popli was only repeating something that Mr. Throw said. That statement, as well as one other about Mr. Throw "claim[ing] he can't cook and leav[ing] the stove on," are outliers in the opinion. Most of Dr. Popli's statements in the report appear to be his opinions, not mere repetition of reported symptoms. That does not mean that Dr. Popli's opinions may not be based in part on reported symptoms, because, as previously discussed, relying on reported symptoms in addition to the psychiatrist's personal observations and evaluations of the patient in forming a medical

64

opinion about a patient's condition is part of the diagnostic technique used in the field of psychiatry. Such reliance is not a valid reason for discounting a psychiatrist's opinion. *See, e.g., Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016) ("[I]t's illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms."); *Regennitter v. Comm'r of Soc. Sec.*, 166 F.3d 1294, 1300 (9th Cir. 1999) (reversing where the ALJ found that two psychologists' opinions were "contrary to the evidence" because the psychologists "appeared to be taking the plaintiff's symptoms at face value," holding that neither psychologist "found any indication that [the plaintiff] was malingering or deceptive" and therefore that "neither psychologist should be faulted for believing [the plaintiff's] complaints"); *Richard C. v. Kijakazi*, No. 2:21-CV-0323-MJD-JPH, 2022 WL 2712370, at *5 (S.D. Ind. July 13, 2022) ("[W]hen it comes to mental health impairments, an ALJ may not discount a medical opinion simply because it is based on the claimant's subjective reports; to do so ignores the nature of mental health treatment."); *Pazour v. Berryhill,* 363 F. Supp. 3d 903, 911 (W.D. Wis. 2019) (rejecting the ALJ's characterization of doctor's opinion as unreliable "because it was based on a 'complete acceptance' of [the plaintiff's] self-reports," observing that the ALJ "fail[ed] to recognize ... a treating physician's ability (indeed, responsibility) to suss out malingers").

Next, the ALJ said that Dr. Popli's opinions regarding Mr. Throw's "lack of concentration, object recall, and doing simple tasks" were inconsistent with Mr. Throw's "clinical presentation," as "discussed above." The problem with this is that the ALJ's description of Mr. Throws' "clinical presentation" relies almost exclusively on three

unsupported assumptions. The first is that normal mental status examinations[48] are somehow substantial evidence that the patient does not suffer from severe psychological impairments,[49] a proposition that courts have rejected time and time again. *See Kangail*, 454 F.3d at 627 (a patient's normal behavior during office visit does not contradict a finding of severe mental illness); *Richard C.*, 2022 WL 2712370, at *6 ("It is not evident to the Court, and the ALJ again does not explain, why she believes a person with these findings on mental status examinations would not have the limitations set forth [in a treating source opinion]."); *Tammy M. v. Saul*, No. 2:20-cv-285, 2021 WL 2451907, at *11 (N.D. Ind. June 16, 2021) (the ALJ "did not explain why he focused on select findings [such as normal speech and language] as a litmus test for mental limitations").

---

[48] Throughout the decision, the ALJ appears to confuse mental status evaluations (MSE) in the various providers' treatment notes, with a Mini-Mental State Examination ("MMSE"), and perhaps, for this reason, is under the incorrect impression that the MSEs are indicative of something more than an evaluation of "a range of mental functions and behaviors *at a specific point in time*." *https://www.brown.edu/Courses/BI_278/Other/Clerkship/Didactics/ Readings/THE %20MENTAL%20STATUS%20EXAMINATION.pdf* (last visited September 27, 2022). "The mental status examination (MSE) is a component of all medical exams and may be viewed as the psychological equivalent of the physical exam." *Id.* On the other hand, "[t]he Mini-Mental Status Exam (MMSE) is a cognitive screening tool that provides a brief, objective measure of cognitive function. It can be used to screen for cognitive impairment, to estimate the severity of the impairment, and to document cognitive change over time." *https://www.psychdb.com/cognitive-testing/mmse* (last visited September 27, 2022). Mr. Throw's score on the MMSE, as reported by Dr. Popli (*see supra*, Background, Section D) was barely above a score typically seen for an institutionalized person suffering from cognitive decline.

[49] Another problem is that the ALJ cites to the various mental status examinations in the record without regard to the longitudinal record to which she cites. For instance, Dr. Khan's mental status examinations in April and May 2019 were in a time period when Mr. Throw first sought treatment for anxiety only. In this regard, the ALJ was arguably using the impermissible "sound-bite" methodology to record evaluation. *Scrogham*, 765 F.3d at 698.

The next illogical assumption the ALJ makes is that a one-time report of improved symptoms is somehow a basis for rejecting a doctor's opinion of a disabling mental impairment. In her discussion of Mr. Throw's "clinical presentation," the ALJ highlighted a few normal findings or temporary improvement as if those are inconsistent with Dr. Popli's opinion. But the Seventh Circuit has repeatedly said that such findings do not contradict substantial evidence in the record of a continued serious impairment, particularly in the context of a mental disorder. *See, e.g., Lanigan v. Berryhill*, 865 F.3d 558, 564 (7th Cir. 2017) (the ALJ's "selective reading of two years of treatment notes is not persuasive"); *Meuser*, 838 F.3d at 912 ("a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition" (quoting *Punzio*, 630 F.3d at 710)). While the medical notes cited by the ALJ indicate some improvement in Mr. Throw's nightmares and/or hallucinations immediately following a change in medication, "[n]o doctor concluded" that Mr. Throw's improvements meant that his mental disorders were less severe than Dr. Popli opined. *Larson*, 615 F.3d at 751. In fact, Mr. Throw testified that, despite the noted improvements, he continued to frequently experience hallucinations, nightmares, and other symptoms. "The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits." *Scott,* 647 F.3d at 740. "Moreover, the ALJ's analysis reveals an all-too-common misunderstanding of mental illness. The very nature of [mental illnesses such as bipolar disorder and schizophrenia] is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Id.*

A third illogical assumption in the ALJ's discussion of Mr. Throw's supposedly inconsistent "clinical presentation" relates to her treatment of Mr. Throw's reports of

hallucinations. The ALJ made several comments such as "no clinician noted responsiveness to internal stimuli." [AR 19; *see also* AR 22 ("he was never witnessed experiencing audio/visual hallucinations")]. As previously noted with regard to a similar comment the ALJ made about no clinician having witnessed Mr. Throw's syncope/pseudo-seizure episodes, that fact that the symptoms in question are not "witnessed" by the doctor treating them is not substantial evidence that Mr. Throw was not experiencing them. *See Adaire*, 778 F.3d at 688; *see also Regenniter*, 116 F.3d at 1300 (""[T]he ALJ does not explain the justification for his expectation that nightmares and panic attacks—intrinsically private, solitary behavior—should be witnessed by strangers."). There is no indication in Dr. Popli's notes describing the audio and/or visual hallucinations Mr. Throw reported to him that he did not believe those reports, and in fact he must have believed them because he prescribed an antipsychotic medication to treat them, increasing the dosage when Mr. Throw reported he was still experiencing the hallucinations. *See, e.g., Adaire*, 778 F.3d at 688 ("far from suggesting that [the plaintiff] was faking his pain this doctor diagnosed him as [two severe impairments], either being a likely cause of pain").

The ALJ seemed to be requiring objective evidence of Mr. Throw's hallucinations in order to consider them as part of his "clinical presentation." But hallucinations are "inherently subjective and intermittent" and cannot be proven by objective evidence. *Bullington v. Kijakazi*, Civ. No. KK-21-7, 2022 WL 816453, at *11 (D.N.M. Mar. 17, 2022); *see also Keri Diane P. v. Kijakazi*, No. CV GLS 21-0918, 2022 WL 3139885, at *4 (D. Md. Aug. 5, 2022) (holding that objective medical evidence is not required to support claimant's reports of hallucinations). As previously noted in the Court's discussion of the ALJ's step two findings, medical documentation to establish a mental impairment based on symptoms of hallucinations generally

consists of a doctor's diagnosis (which may rely on the patient's self-reports). Had the ALJ applied the special technique at step two, she would have recognized that Mr. Throw's hallucinations were part of a medically determinable impairment. Not only did she fail to do so, but she then compounded her step two error in her RFC findings by failing to realize Dr. Popli's opinion could not be discounted as "inconsistent with" Mr. Throw's clinical presentation on the ground that Mr. Throw never hallucinated during the hour he was seen by a clinician.

Apart from discounting the supportability of Dr. Popli's opinion for erroneous reasons and citing to evidence that was not inconsistent with his medical opinion, the ALJ also erred in ignoring overwhelming information that contradicted her conclusions regarding the supportability and inconsistency factors. *See, e.g., Scrogham*, 765 F.3d at 698–700 (reversing because ALJ had disregarded evidence undermining finding that claimant wasn't disabled). For instance, in saying that there was no persuasive objective or clinical evidence to support Dr. Popli's opinion, the ALJ failed to mention the PHQ-9 and GAD-7 scores Dr. Popli recorded. *See Irwin*, 2008 WL 2151417, at *10 ("the ALJ did not discuss all of her GAF scores … which reflect serious symptoms or serious impairment in social, occupational, or school functioning"). In addition, the Court is unable to find a single reference in the ALJ's decision to Mr. Throw's nightmares and other disabling PTSD-like symptoms, despite the ALJ having found a severe "traumatic" disorder. Moreover, the ALJ mentioned Mr. Throw's symptoms of paranoia only twice, both times in reference to a May 2020 mental status evaluation during a telehealth appointment with Dr. Popli in which Mr. Throw "denied paranoia" and/or Dr. Popli assessed Mr. Throw "with no paranoia" during that session. The ALJ also inadequately addressed the functional limitations that Mr. Throw's syncope/pseudo-seizure episodes posed

on Mr. Throw's ability to work.[50] Instead, the ALJ's only discussion of the issue was that her RFC finding accommodated Mr. Throws "subjective reports of seizures" by including climbing and hazard limitations in Mr. Throw's RFC. The ALJ did not explain how this limitation was sufficient to address Mr. Throw's numerous credible reports of losing consciousness and then awakening in a disoriented state.

The ALJ also did not acknowledge the support and substantiation of Dr. Popli's opinion in his own treatment notes as well as those of Dr. Khan and Ms. Chase. Clinically, Mr. Throw was described as sad, dysphoric, illogical, paranoid with flight of ideas, having visual and auditory hallucinations, and having poor insight and judgment. Dr. Popli said Mr. Throw had trauma issues that could be playing a role in his hallucinations, and that his irritability was consistent with a bipolar disorder or PTSD. Ms. Chase reported disabling symptomatology, including nightmares, suicidal ideation, and disassociating events, and concluded that Mr. Throw could not work because he would be a danger to himself and to others due to dissociating and forgetfulness.[51]

---

[50] *See Gronbeck v. Schweiker*, 534 F. Supp. 642, 645–46 (D.S.D. 1982) ("The fact that seizures, blackouts, dizziness or other symptoms are 'episodic' does not preclude a finding of a disability within the meaning of the Act. The 'continuous period' language of § 423(d)(1)(A) does not require a claimant to show an inability to engage in any substantial gainful activity every day of his life. Accordingly, courts have found claimants 'disabled' under the Act, when they suffered sporadic blackouts, dizziness and seizures.").

[51] The ALJ inaccurately minimized Ms. Chase's treatment records by stating that Mr. Throw was seeing Ms. Chase over "increased familial stressors." Ms. Chase's Diagnostic Assessment Report states that Mr. Throw came to the initial session with complaints of severe mood changes, anger, and nightmares that "wake him in terror" and "continue to distress him during the day." There actually is very little in Ms. Chase's treatment notes about current "increased familial stressors" although the records indicate discussion of Mr. Throw's family history that might have been a reason for Mr. Throw's nightmares, anger, and severe mood changes. The ALJ also mischaracterized Ms. Chase's mental health diagnoses, stating that she "not[ed] nothing more than some depression," and that, "fortunately, on follow up in late July,

The ALJ "must confront the evidence that does not support [his] conclusion and explain why that evidence was rejected." *Taylor v. Colvin*, 829 F.3d 799, 802 (7th Cir. 2016). The ALJ failed to do that here. By not addressing any of the above evidence, the ALJ failed to provide a logical bridge between the evidence and her conclusion rejecting Dr. Popli's opinion. *See, e.g., Tammy M.*, 2021 WL 2451907, at *11 (reversing where "the ALJ did not acknowledge the supportive evidence that [the treating medical source] set forth with the opinion including panic attacks, shortness of breath, social isolation, sadness, loss of interest, 'brain fog,' sleep problems, appetite changes, decreased energy, past thoughts of suicide, an abnormal affect, feelings of guilt/worthlessness, mood disturbance, difficulty thinking or concentrating, emotional withdrawal/isolation, easy distractibility, anxiety, short term memory impairment, and sleep disturbance"); *Wilson v. Berryhill*, No. 3:17-CV-253 RLM-MGG, 2018 WL 1174269, at *2 (N.D. Ind. Mar. 5, 2018) ("Dr. Duryea repeatedly opined in [the plaintiff's] treatment notes that … [she] had very high anxiety, with 'several phobias,' PTSD symptoms, and a racing heart at work.").

Finally, the ALJ never acknowledged that Dr. Popli was a treating specialist, who had been seeing Mr. Throw for the past eight months. *See Scott*, 647 F.3d at 740 (finding that the ALJ's consideration of a medical opinion was unsatisfactory and required a remand because the opinion was by a psychiatrist who saw the plaintiff on a monthly basis for over a year and

---

[Mr. Throw's] mood and affect normalized." [AR 22]. Ms. Chase diagnosed Mr. Throw with adjustment disorder with mixed disturbance of emotions and conduct, PTSD, and nightmare disorder. And she never found that his psychological impairments had "normalized." Immediately following her last session with Mr. Throw, Ms. Chase reported that he remained "tearful and sad," "struggled with his human identity," and was being treated for "suicidal ideation."

it "was not apparent that the ALJ considered any of these factors"); *John B. v. Kijakazi*, No. 3:21CV485, 2022 WL 669900, at *6 (N.D. Ind. Mar. 7, 2022) (opinions by treating sources or relevant specialists typically are entitled to more weight (citing 20 CFR 404.1520c(3)(c)(1)– (4)). This omission was particularly troubling because the ALJ rejected Dr. Popli's opinion without there being any contrary medical opinion in the record. As explained earlier, the state agency psychological reviewer at the reconsideration level did not reach any conclusions regarding Mr. Throw's mental impairments due to a lack of medical evidence prior to the time period in which most of the Mr. Throw's mental health treatment occurred and/or her "FTC" finding. And the ALJ did not seek to develop the record further once Mr. Throw's mental condition deteriorated as shown by the records reflecting later mental health treatment, by, for example, requesting a consultative psychological examination. The Seventh Circuit has "insisted that an ALJ must not substitute their own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)). "[B]y rejecting [Dr. Popli's] opinion …, the ALJ effectively substituted [her] own judgment for that of the treating [psychiatrist], which an ALJ cannot do." *Oakes v. Astrue*, 258 F. App'x 38, 45 (7th Cir. 2007). In short, the ALJ failed to demonstrate that Dr. Popli's opinion was not well supported by medical findings and/or was inconsistent with other substantial evidence in the record. As a result, the Court finds that the ALJ erroneously rejected Dr. Popli's opinion.

### E.    REQUEST FOR AN IMMEDIATE AWARD OF BENEFITS

Plaintiff asks the Court to reverse the ALJ's decision and remand with instructions to award benefits. Pursuant to Sentence Four of 42 U.S.C. § 405(g), the Court can affirm, modify or reverse the Commissioner's decision with or without remanding the case for further

proceedings. A remand for an award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011); *see also Briscoe ex rel. Taylor*, 425 F.3d at 355. Whether to remand for further proceedings or an award of benefits is within the Court's discretion. *Allord*, 631 F.3d at 415-16 (citing *Nelson v. Apfel*, 210 F.3d 799, 802 (7th Cir. 2000)).

Plaintiff argues that "it is not disputed that the paragraph A criteria of 12.04, 12.06, and/or 12.15 are met." [DE 17 at 15]. The Commissioner has not contested that statement, and the Court's own review of the record indicates that the undisputed evidence likely shows the existence of the paragraph A criteria for at least Listings 12.04, Depressive, bipolar and related disorders, and Listing 12.06, Anxiety and obsessive-compulsive disorders.[52] As to Listing 12.03, Schizophrenia spectrum and other psychotic disorders, the Commissioner argues that Plaintiff has not met her burden at step three of "identif[ing] all of the required regulatory criteria," and further that Plaintiff "neglects to explain how the evidence satisfied those

---

[52] Specifically, the Court's review of the record shows there is undisputed evidence of: (1) the required minimum of five out of the nine paragraph A criteria for depressive order in Listing 12.04 (depressed mood, appetite disturbance with change in weight, sleep disturbance, difficulty concentrating or thinking, and thoughts of death or suicide), *see* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04(A)(1); and (2) the required minimum of three out of the six paragraph A criteria for an anxiety disorder in Listing 12.06 (easily fatigued, difficulty concentrating, irritability, and sleep disturbance), *see id.* § 12.06(A). For Listing 12.15, Trauma- and stressor-related disorders, the Court is only certain of undisputed evidence of four of the required five paragraph A criteria (exposure to violence, intrusive memories, dreams or flashbacks in which the violence is re-experienced, disturbance in mood and behavior, and sleep disturbance), *see id.* § 12.15(A). It is not clear whether evidence exists of the fifth required criteria (avoidance of external reminders of the event). *Id.* In addition, the Court cannot say whether the record contains medical documentation of at least three of the seven paragraph A criteria for bipolar disorder in Listing 12.04, *see id.* § 12.04(A)(2).

criteria." [DE 18 at 9 n.5]. That is questionable. To satisfy paragraph A for Listing 12.03, there must be evidence of only one of the following three criteria: (1) delusions or hallucinations; (2) disorganized thinking (speech); or (3) grossly disorganized behavior or catatonia. *Id.* § 12.03(A). As previously discussed in the Court's review of the ALJ's step 2 analysis, the record includes medical documentation sufficient to show the existence of hallucinations under the first criterion. Thus, Plaintiff need only show that the criteria of either paragraph B or paragraph C are indisputably satisfied to demonstrate an entitlement to benefits. The Court's previous findings strongly suggest that the evidence is sufficient to find that Mr. Throw satisfied the paragraph C criteria. But the Court declines to make that determination in this order. Instead, the Court concludes that a finding in favor of Mr. Throw at step 5 of the evaluative process is all but mandated by Dr. Popli's opinion together with the testimony of the VE.

The Court has found that the ALJ failed to afford Dr. Popli's opinion the appropriate weight. And Dr. Popli opined that Mr. Throw's functional limitations included that he would be off-task 25% or more of the workday and absent four or more times per month. The VE testified that an employer's tolerance for absences in a competitive work environment would be no more than seven per year, occurring no more than once a month. [AR 74]. Further, the VE testified that 10 percent or more off-task time in a work-day would preclude competitive employment. [AR 74]. In *Kaminski v. Berryhill*, 894 F.3d 870 (7th Cir. 2018), the Seventh Circuit awarded benefits where "[t]he vocational expert testified that a person with the limits that [the medical opinion] had ascribed to [the plaintiff] simply would not be able to able to sustain full-time employment." *Id.* at 876. Furthermore, the court found there was "no sound basis in the record to dispute that opinion." *Id.* Thus, the court concluded, ""all factual issues involved in the entitlement determination have been resolved and the resulting record supports

74

the conclusion that the applicant qualifies for disability benefits." *Id.* (quoting *Allord*, 631 F.3d at 415). Similarly, in *Punzio*, 630 F.3d at 713, the Seventh Circuit held that the treating psychiatrist's mental residual functional capacity finding was well supported and consistent with the medical evidence, "so it must carry the day," and that, "because the record [did] not contain a conflicting opinion," the court did not need to "prolong these proceedings any further. Given [the doctor's] assessment and the vocational expert's testimony that no jobs in the national economy [could] be filled by a person with [the plaintiff's] mental limitations," the court held that "the only possible outcome" was a finding of disability and remanded for benefits.[53]

Mr. Throw's significant mental deterioration *after* filing for benefits in September 2018 and after agency review at the initial and reconsideration level was conducted, is well documented in the record before the ALJ at the time of her decision. Yet there is no indication that steps were ever taken to obtain a state psychiatric consultative review, despite the obviously incomplete mental review that had been conducted by the state psychological examiner, as that examiner's findings recognized. As a result, Dr. Popli's opinion is uncontested in the evidence, and, because Mr. Throw has passed, there is little to no opportunity for further development of the record.[54] Dr. Popli's opinion about the number of days per month Mr. Throw was likely to

---

[53] In contrast, in *Israel v. Colvin*, 840 F.3d 432 (7th Cir. 2016), the Seventh Circuit upheld the district court's decision declining to order benefits, where the record included *some* evidence that could be read to undermine the plaintiff's claim, including the opinions of two non-treating physicians, MRI results that had yet to be interpreted by a competent medical source, the incomplete opinion of a State doctor, and physical examination findings over the years that presented an unclear picture of the effectiveness of various treatments for the plaintiff's persistent pain. *Id.* at 441.

[54] The Court finds it difficult to imagine that any medical or psychological professional would be able to prepare a useful retrospective of Mr. Throw's mental impairments from 2019 through

be absent given his mental impairments is well supported and consistent with the medical evidence. The only conclusion that can be drawn from that opinion given the VE's testimony is that Mr. Throw was disabled at least as of the date of Dr. Popli's opinion.

One unresolved issue remains, however, which is the onset date of Mr. Throw's disability taking into consideration all of his combined mental and physical impairments. In this regard the Court notes that Mr. Throw's alleged onset date of July 17, 2018 was based solely on his physical impairments, although those impairments may have involved an as-yet undiagnosed mental component. Mr. Throw did not allege disability based on mental impairments until November 20, 2019. [AR 223-230]. He first sought treatment from a mental health professional for his mental disorders in July 2019. It is appropriate to leave the determination of an onset date for the Commissioner on remand. The Commissioner should note that if, in the process of assessing an appropriate onset date the Commissioner is able to determine in a manner consistent with the findings in this opinion that Mr. Throw did *not* become disabled at any time before the ALJ issued her opinion—a finding which seems all but impossible given Dr. Popli's opinion but which the Court will not say is totally foreclosed by this opinion and order—such an outcome would require exacting defenses upon any subsequent judicial review.

---

his death in December 2020 that would be entitled to more weight than the medical opinion of Dr. Popli, who actually treated Mr. Throw. *See Phillips v. Astrue*, 912 F. Supp. 2d 749, 761 (S.D. Ind. 2012) ("The examination of a claimant is particularly important when dealing with mental impairments." (citing, inter alia, *Westphal v. Eastman Kodak Co.*, No. 05–CV–6120, 2006 WL 1720380 *5 (W.D.N.Y. June 21, 2006) ("Because of the inherent subjectivity of a psychiatric diagnosis, and because a proper diagnosis requires a personal evaluation of the patient's credibility and affect, it is the preferred practice that a psychiatric diagnosis be made based upon a personal interview with the patient."))).

## CONCLUSION

Based on the foregoing, the Commissioner's final decision is **REVERSED AND REMANDED**. Upon remand, the Commissioner is directed to determine an onset date for disability, and to then calculate and award benefits accordingly, or issue an alternative finding consistent with all of this Court's findings above. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Plaintiff and against Defendant.

ORDERED this 30th day of September, 2022.

s/ Joshua P. Kolar_____
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT